# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 19, 2016　　　　　Decided June 14, 2016

No. 14-3073

UNITED STATES OF AMERICA,
APPELLEE

v.

HAROLD DELONTE CASTLE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cr-00067-1)

*Tony Axam Jr.*, Assistant Federal Public Defender, Office of the Federal Public Defender, argued the cause for Appellant. With him on the briefs was *A.J. Kramer*, Federal Public Defender.

*Ryan M. Malone*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Vincent H. Cohen Jr.*, Acting U.S. Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Todd W. Gee*, Assistant U.S. Attorneys.

Before: MILLETT, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Dissenting opinion filed by *Senior Circuit Judge* SILBERMAN.

EDWARDS, *Senior Circuit Judge*: On March 25, 2014, Appellant Harold Castle was charged, in a one-count indictment, with possession with intent to distribute 100 grams or more of a mixture containing a detectable amount of phencyclidine ("PCP"), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iv). The charge was based on physical evidence and a statement obtained as a result of Appellant's warrantless seizure on the evening of February 24, 2014. Prior to trial, Appellant filed a motion to suppress the evidence, arguing that he was stopped by police officers without reasonable, articulable suspicion in violation of the Fourth Amendment. After a hearing, the District Court denied the motion. A jury found Appellant guilty of the lesser-included offense of possession with intent to distribute a detectable amount of PCP, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c). On October 21, 2014, the District Court sentenced Appellant to 65 months imprisonment to be followed by six years of supervised release. Appellant now appeals the denial of his suppression motion.

## I. INTRODUCTION

The District Court found that, on the evening in question, the seizing officers were on patrol in an unmarked pickup truck. The officers turned onto Yuma Street (a residential block in southeast Washington, D.C.) and saw Appellant walking quickly from the direction of an apartment complex outside of which PCP was known to be sold and toward an alleyway next to a house across the street. The alley led to a

vacant yard. The District Court also found that, after they pulled up in front of the house, the officers saw Appellant lean over near a U-Haul truck parked in the yard.

The District Court additionally credited the officers' testimony that they patrolled the area so regularly that "people in the neighborhood" had come to recognize their unmarked truck as a police vehicle, to expect such patrols, and to act as "lookouts." On the basis of these generalized findings regarding "the neighborhood," the District Court concluded that it was "not unreasonable for the officers to believe [Appellant] knew or suspected their vehicle was a police vehicle." Consequently, the District Court found that it also was not unreasonable for the officers to believe that Appellant was walking quickly in order to evade them and that he leaned over near the U-Haul in response to their presence. Finally, the District Court found that when the officers approached Appellant as he walked out of the backyard area, they recognized him from several prior seizures that had occurred some six to nine months earlier. Based on the totality of the foregoing findings of historical fact and inferences from those facts, the District Court concluded that the officers had reasonable, articulable suspicion that Appellant had just committed or was about to commit a criminal offense when they seized him. We disagree.

"Under the Fourth Amendment our society does not allow police officers to 'round up the usual suspects.'" *United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006). An officer relying on his or her "knowledge of [an individual's] criminal record" is "required to pair" that knowledge with "'concrete factors' to demonstrate that there [is] a reasonable suspicion of *current* criminal activity." *United States v. Foster*, 634 F.3d 243, 247 (4th Cir. 2011) (emphasis added) (citation omitted). In other words, knowledge of an

"individual's criminal history" can "corroborate[]," but not substitute for "objective indications of ongoing criminality." *United States v. Monteiro*, 447 F.3d 39, 47 (1st Cir. 2006).

The law also makes clear what is eminently logical. In order to find that a person is evading the police, there must be evidence that the person has knowledge of a police presence. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Similarly, in the context of a reasonable, articulable suspicion analysis, "furtive gestures 'are significant only if they were undertaken in response to police presence.'" *United States v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003) (quoting *United States v. Edmonds*, 240 F.3d 55, 61 (D.C. Cir. 2001) (quoting *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000))). In both instances, the putatively evasive or furtive conduct cannot provide the necessary evidence of knowledge of a police presence. There must be independent evidence from which that knowledge can be inferred. *See Wardlow*, 528 U.S. at 124; *Brown*, 334 F.3d at 1168; *Edmonds*, 240 F.3d at 57, 61-62; *Johnson*, 212 F.3d at 1316-17.

As we explain more fully below, there is no such evidence here. Certainly the officers' assumption that Appellant knew of the presence of their truck on the evening in question gains no support from general knowledge in the neighborhood that the truck was a police vehicle. The ability of neighborhood people to recognize the truck as a police vehicle cannot support an inference that Appellant had knowledge of the presence of that known police vehicle on the evening he was stopped. And the record is entirely devoid of any evidence from which a reasonable officer could infer that Appellant knew of the truck's (and therefore the officers') presence before he was stopped. There is, for example, no testimony that Appellant so much as glanced in the direction of the officers' truck at any point after the

officers turned onto Yuma Street. Nor is there evidence that Appellant was ever in close proximity to the truck. Neither did the officers testify that anyone else in the neighborhood alerted Appellant or that a "lookout" set off a general alarm that a known police vehicle was on the block. In other words, the officers' critical assumption of knowledge was based on *nothing*.

It is therefore clear that the Government failed to carry its burden of demonstrating that the actions of Appellant on the evening in question amounted to "concrete factors" or "objective indications" that he had just committed or was about to commit a criminal offense. Walking quickly on a very cold evening is commonplace, not suspicious, activity. So, too, is walking into an alleyway, leaning over, and walking out. These actions are entirely mundane. The fact that they took place in a residential neighborhood plagued by drug use did not allow the police officers to ignore the dictates of the Fourth Amendment. *See United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997) (prior conviction "for a narcotics offense" and presence "in a neighborhood with a high incidence of drug traffic," without "(other) particularized evidence that indicates criminal activity is afoot," is insufficient to demonstrate reasonable, articulable suspicion).

Under *Ornelas v. United States*, 517 U.S. 690 (1996), we give "due weight" to a District Court's determination of the reasonableness of inferences drawn by police officers from historical facts. *Id*. at 700. In assessing this determination, however, we are obliged to adhere to the Supreme Court's admonition that "due weight must be given, *not* to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio*, 392 U.S 1, 27 (1968). As we explain below, because the

District Court's determination that the officers' inference that Appellant was aware of their presence had no basis in the factual record, it is entitled to no weight. We therefore reverse.

## II. BACKGROUND

The events giving rise to Appellant's seizure took place on February 24, 2014, in the 100 block of Yuma Street, Southeast, Washington, D.C. This long block, which begins at First Street on the west and terminates in a cul-de-sac on the east, consists of a mix of small apartment buildings and single family homes.

At approximately 6:30 p.m. on a very cold evening, Metropolitan Police Department Officers Olszak and Moseley were patrolling in an undercover police vehicle – an unmarked Dodge Ram truck. The officers were not in uniform, but were wearing vests with the word "Police" on the front and back. Upon turning onto the 100 block of Yuma, the officers noticed two men at the opposite end of the block, near the cul-de-sac. What caught the officers' attention was the fact that the men were walking quickly as they crossed from the right sidewalk near 133 Yuma – an apartment building in front of which PCP was known to be sold – to 144 Yuma, a single family home on the opposite side of the street.

As the officers drove toward the cul-de-sac, Appellant continued across the street and into an alleyway between 144 Yuma and the house next door, out of the officers' field of vision. The officers sped up a bit; however, when they pulled up in front of 144 Yuma, Appellant had nearly reached a U-Haul truck parked in the backyard of 144 Yuma, some 125 feet from the street. The other man, later identified as a Mr. Banks, had stopped at the front corner of 144 Yuma,

apparently to urinate. The officers got out of their truck, and Officer Olszak ran toward the alleyway after Appellant, while Officer Moseley walked over to Mr. Banks.

Just before Officer Olszak entered the alley, he saw Appellant, now on the far side of the U-Haul, bend over while one of his legs "kick[ed] up" parallel to the ground and then stand back up. Officer Moseley, still near the front of the house, saw Appellant bend over, but did not see his leg lift up. Each officer's view was partially obstructed by the U-Haul. At this point, neither officer had recognized Appellant as Harold Castle.

The officers then observed Appellant walking back toward Yuma Street with his hands in his pockets. Officer Olszak, who came face to face with Appellant in the alleyway between the houses, ordered Appellant to remove his hands from his pockets. It was only after Appellant obeyed Officer Olszak's order that Officer Olszak recognized him as Harold Castle.

Officer Olszak had, on several prior occasions, seen Appellant in front of the apartment building at 133 Yuma Street with other men. Officer Olszak also recognized Appellant from several prior seizures that occurred some six to nine months earlier. Two of these prior seizures resulted in Appellant's arrest for PCP-related crimes. One involved a car and foot chase in a different neighborhood. Another, which took place in front of 133 Yuma Street, involved an attempt by Appellant to avoid arrest by disposing of a vial of liquid that had the distinct odor of PCP. And one seizure involved a foot chase that started in the 100 block of Yuma, but turned up no contraband and so Appellant was not arrested.

Having recognized Appellant as Mr. Castle, Officer Olszak touched him on his arm and told him to "hold on for a sec." Officer Olszak then ran to the backyard to investigate the U-Haul truck. Meanwhile, Appellant walked over to Officer Moseley, who had detained Mr. Banks following a consensual frisk that had turned up no contraband.

As Appellant neared Officer Moseley, Moseley recognized him as Harold Castle. Like Officer Olszak, Officer Moseley was familiar with Appellant as a result of Appellant having been seized in the past and his general presence in the neighborhood. Officer Moseley also smelled the odor of PCP emanating from Appellant.

At this point, Appellant had put his hands back in his pockets and appeared agitated and nervous. Officer Moseley ordered him to sit down on the curb. Appellant sat down, but immediately jumped back up, complaining that his pants were clean and he did not want to get them dirty. Officer Moseley again told Appellant to sit down, and he complied.

While Appellant was sitting on the curb, Officer Moseley saw him place a small vial on the ground and lean over it. Based upon the vial's appearance and its smell, Officer Moseley suspected that it contained PCP. Officer Moseley arrested Appellant shortly afterward. In a search incident to that arrest, officers recovered a pack of cigarettes, a cell phone, a pair of black rubber gloves, paperwork in Appellant's name, and approximately fifteen dollars in cash.

While Officer Moseley was interacting with Appellant on Yuma Street, a crime scene search officer joined Officer Olszak at the U-Haul. Sometime after Appellant was arrested, Officer Olszak and the crime scene search officer found an

eight-ounce bottle of liquid near the U-Haul that smelled like PCP, as well as a plastic bag of black vial caps.

After being charged and prior to trial, Appellant filed a motion to suppress the evidence obtained as a result of his seizure, including the one-ounce vial recovered by Officer Moseley and a statement Appellant allegedly made when arrested. Appellant did not seek to suppress the eight-ounce bottle of PCP or the vial caps. During a hearing before the District Court, Officers Olszak and Moseley provided the only evidence regarding the events leading to Appellant's arrest.

Based on the officers' testimony, the District Court made findings of fact and determined that, as a matter of law, Officer Olszak stopped Appellant when he touched him on the arm and instructed him to "hold on." The Court also determined that at that point, the officers had reasonable, articulable suspicion to stop Appellant. The District Court consequently denied Appellant's motion to suppress.

### III. STANDARDS OF REVIEW

When presented with an appeal of the denial of a motion to suppress evidence on Fourth Amendment grounds, we review *de novo* preserved claims regarding whether and when a seizure occurred. *See United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014). We also review *de novo* a district court's "ultimate determination[]" of whether a police officer had the reasonable, articulable suspicion or probable cause necessary to legally effectuate any such seizure. *Ornelas v. United States*, 517 U.S. 690, 697, 699 (1996); *see also United States v. Bailey*, 622 F.3d 1, 5 (D.C. Cir. 2010). Under *Ornelas*, we give "due weight" to a District Court's determination of the reasonableness of inferences drawn by

police officers from historical facts. 517 U.S. at 700. In assessing this determination, however, we are obliged to adhere to the Supreme Court's admonition that "due weight must be given, *not* to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S at 27. While we "may consider both evidence offered at the suppression hearing and the trial," *Bailey*, 622 F.3d at 5, when, as here, the District Court has made factual findings, we may not search the record for any reasonable view of the evidence that will support the trial judge's conclusions, *id.* at 5 n.1. Rather, we must review the factual findings of the District Court and, assuming they are not clearly erroneous, determine whether they support the contested seizure. *See id.* Finally, suppression arguments that are not presented to the trial court are deemed waived and cannot be argued on appeal. *See United States v. Hewlett*, 395 F.3d 458, 460-61 (D.C. Cir. 2005).

## IV. ANALYSIS

### A. The Seizure

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be 'reasonable.'" *Brown v. Texas*, 443 U.S. 47, 50 (1979) (alteration in original) (citations omitted). A seizure occurs "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *Brodie*, 742 F.3d at 1061 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

Whether police action amounts to a "show of authority" requires the court to ask whether a "reasonable person" "in view of all the circumstances surrounding the incident, . . . would have believed that he was not free to leave." *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Factors considered in assessing whether an officer's actions amounted to a show of authority "include whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's 'use of language or tone of voice indicat[ed] that compliance with the officer's request might be compelled.'" *Id.* (alteration in original) (quoting *Mendenhall*, 446 U.S. at 554).

The Supreme Court has repeatedly held that police do not manifest a show of authority "merely [by] approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting some questions to him if the person is willing to listen," provided the officers do not imply that answers are obligatory. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984) (per curiam); *INS v. Delgado*, 466 U.S. 210, 215-17 (1984); *Mendenhall*, 446 U.S. at 555; *United States v. Lewis*, 921 F.2d 1294, 1297-98 (D.C. Cir. 1990) (no seizure arises when officers, "displaying no weapons and speaking in a normal tone of voice, approach individuals in a public place and ask permission to talk with them" (citation omitted)).

If police behavior amounts to a show of authority, a seizure will be found if the individual at whom the show of

authority is directed submits. *Hodari D.*, 499 U.S. at 628-29; *see also Brodie*, 742 F.3d at 1061; *Wood*, 981 F.2d at 538.

Relying on *Hodari D.* and *Brodie*, Appellant, who bears the burden of demonstrating that he was seized, *see United States v. Goddard*, 491 F.3d 457, 462 (D.C. Cir. 2007) (per curiam), argues that he was stopped when Officer Olszak ordered him to remove his hands from his pockets and he complied. A careful review of the record, however, leaves no doubt that Appellant did not preserve this claim. Quite the contrary. The record is clear that Appellant's counsel's argument was that the stop was inexorably tied to Officer Olszak's touch and directive to "hold on." Tr. of Motions Hearing at 120-21, 130 (June 30, 2014). Consequently, Appellant's claim regarding the stop is similarly limited before this court. *See Hewlett*, 395 F.3d at 460-61.

We agree with the District Court that Appellant was seized when Officer Olszak touched Appellant and instructed him to "hold on" and Appellant complied. Applying the *Mendenhall* factors, we are satisfied that Appellant was subject to the requisite show of authority when Officer Olszak, wearing a vest labeled "Police," ran up to him in a dark, narrow alley (effectively blocking Appellant's path to Yuma Street), "ordered" Appellant to remove his hands from his pockets, and, in response to Appellant's unquestioning compliance, initiated physical contact and instructed Appellant to "hold on," all within sight of Officer Moseley who was detaining Mr. Banks. At this point, Officer Olszak had "accost[ed]" Appellant and "restrain[ed] his freedom." *Brown*, 443 U.S. at 50 (citation omitted). As the District Court found, no reasonable person in Appellant's position and subject to Officer Olszak's directives would have believed that he was free to go on about his business.

This conclusion is consistent with our precedent. Thus, for example, in *Wood*, we found that a show of authority occurred when a uniformed officer, at night, followed an individual into a dark entrance hallway of an apartment building and, positioning himself behind the individual, ordered, "[H]alt right there." 981 F.2d at 540.

A recent decision by the District of Columbia Court of Appeals, *In re J.F.*, 19 A.3d 304 (D.C. 2011), is also instructive, albeit not binding. In that case, two Metropolitan Police Department plainclothes officers who were wearing "Police" vests got out of an undercover car and approached an individual and his companion on a deserted street. *Id.* at 306, 310. One of the officers ordered the individual to remove his hands from his pockets and then asked him some questions. *Id.* at 306. The other officer searched the individual's companion and, when no contraband was found, detained that person while a warrant check was run. *Id.* at 309-10. The court held that the individual who was instructed to remove his hands from his pockets was subject to a show of authority resulting in an illegal seizure. *Id.* at 310; *see also Brodie*, 742 F.3d at 1060-61 (Government conceded a show of authority when two officers pulled their car parallel to a person on a sidewalk in front of townhomes and one officer "got out of the car and told [the individual] to put his hands on a nearby car"); *United States v. Jones*, 584 F.3d 1083, 1085, 1087 (D.C. Cir. 2009) (Government conceded a seizure when an officer wearing a utility vest with the word "POLICE" on it got out of his car and, walking toward an individual who was among 15 or 20 people gathered throughout a block in what appeared to be "somewhat of a party atmosphere," "instructed" the individual from a distance of less than 10 feet to "[c]ome here").

The Government does not suggest that Officer Olszak's actions did not amount to a show of authority. Rather, the Government argues that Appellant was not seized when Officer Olszak confronted him because "[A]ppellant continued walking without pausing when Officer Olszak said 'hold on for a sec.'" Br. for Appellee at 24 n.17. The Government's argument is disingenuous. The District Court found, based on Officer Olszak's own testimony, that Officer Moseley, who "had detained Mr. Banks at the front of the house," "'took over' the detention of Defendant." *United States v. Castle*, 53 F. Supp. 3d 95, 99 (D.D.C. 2014). The trial judge thus credited Officer Olszak's testimony that when Appellant continued walking after being told to stop, he was walking toward Officer Moseley and, according to Officer Olszak, was "'not trying to go anywhere,'" but rather had "'submitted.'" *Id.* at 100. The Government does not contend that the District Court's findings are clearly erroneous.

It is hard to imagine a more submissive response to Officer Olszak's directive to "hold on" given that, upon issuing it, Officer Olszak ran to the backyard, leaving Appellant unattended. Rather than attempting to evade Officer Moseley via the now clear path to Yuma Street, Appellant exhibited complete submission to police authority by walking directly to Officer Moseley. In sum, we reject the Government's argument that the District Court erred in its conclusion as to when the seizure happened.

### B. Reasonable Articulable Suspicion

Pursuant to the Fourth Amendment, a police officer who seizes a person on less than probable cause "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," *Terry*, 392 U.S at 21, support "a reasonable and articulable suspicion that the

person seized is engaged in criminal activity," *Reid v. Georgia*, 448 U.S. 438, 440 (1980) (per curiam) (citing *Brown*, 443 U.S. at 51). *See also Ornelas*, 517 U.S. at 696. It is the Government's burden to provide evidence sufficient to support reasonable suspicion justifying any such stop. *See Brown*, 443 U.S. at 51-52; *see also Royer*, 460 U.S. at 500.

When reviewing a District Court's reasonable, articulable suspicion assessment, we look, as does the District Court, to the totality of the circumstances, understanding that factors individually "susceptible to an innocent explanation" may "suffice[] to form a particularized and objective basis" when taken together. *United States v. Arvizu*, 534 U.S. 266, 277 (2002). In considering the totality of the circumstances, it is "imperative" that we look only to "the facts available to the officer at the moment of the seizure." *Terry*, 392 U.S. at 21-22; *see also Ornelas*, 517 U.S. at 696; *Sibron v. New York*, 392 U.S. 40, 64 (1968); *Rios v. United States*, 364 U.S. 253, 261-62 (1960) (facts discovered as a result of or subsequent to the seizure may not be considered). And we must assess those facts within an objective framework: "'[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in his belief' that the suspect is breaking, or is about to break, the law." *Edmonds*, 240 F.3d at 59 (quoting *Terry*, 392 U.S. at 27); *see also United States v. McKie*, 951 F.2d 399, 402 (D.C. Cir. 1991) (per curiam) ("[W]e . . . determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have [had a reasonable, articulable suspicion].").

In undertaking this *de novo* review of a District Court's "ultimate determination[]" that a seizing officer had the reasonable, articulable suspicion necessary to effectuate a particular stop, we must "take care both to review findings of historical fact only for clear error and to give due weight to

inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, 517 U.S. at 697, 699. With respect to findings of historical fact, this means that we will find error if, looking to the entire record, we are definitely and firmly convinced that the trial court made a mistake. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). With respect to inferences from those historical facts, the Supreme Court has instructed that when the inferences at issue are a police officer's, "[a]n appeals court should give due weight to a trial court's finding that the officer was credible and the inference reasonable." *Ornelas*, 517 U.S. at 700. But in assessing a trial court's reasonableness determination, it is critical that we also keep in mind the Supreme Court's admonition that "due weight must be given, *not* to [an officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27 (emphasis added); *see also Wardlow*, 528 U.S. at 123-24; *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (a "reasonable suspicion" requires "more than an inchoate and unparticularized suspicion or hunch" (citation omitted)). Moreover, an appellate court has the "power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984); *see also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982) ("[I]f the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard.").

Finally, as noted above, and as particularly relevant to this case, the Fourth Amendment "does not allow police officers to 'round up the usual suspects.'" *Laughrin*, 438 F.3d

at 1247. Consequently, an officer relying on his or her "prior knowledge of [an individual's] criminal record" is "required to pair" that knowledge "with some more 'concrete factors' to demonstrate that there [is] a reasonable suspicion of *current* criminal activity." *Foster*, 634 F.3d at 247 (emphasis added). This means that knowledge of an "individual's criminal history [can] corroborate[]," but not substitute for, particularized, "objective indications of ongoing criminality." *Monteiro*, 447 F.3d at 47.

In this case, the Government argues that four circumstances support its contention that Officers Olszak and Moseley had the reasonable, articulable suspicion necessary to stop Appellant:

(1) The officers' knowledge that the neighborhood was a high-crime area particularly associated with PCP distribution.

(2) The officers' observation, while on patrol in their unmarked Dodge Ram truck, of Appellant walking quickly away from 133 Yuma Street (a building known for PCP distribution) and toward an abandoned house.

(3) Appellant's furtive movements in an alley next to the abandoned house.

(4) The officers' prior experience with Appellant, which included PCP-related arrests.

*See* Br. for Appellee at 18-19. An additional fact cited by the Government – the odor of PCP that Officer Moseley noticed *after* he took over the detention of Appellant – is not cognizable because it was not known to the officers before

Officer Olszak seized Appellant. *See Terry*, 392 U.S. at 21-22; *United States v. Holmes*, 360 F.3d 1339, 1345 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1098 (2005).

The lynchpin of any reasonable suspicion analysis in this case must be the second and third factors. The first factor – the high crime nature of the neighborhood – is not unimportant. But it is only a "contextual consideration[]" and, as such, cannot provide the kind of information particular to Appellant that is necessary to demonstrate reasonable suspicion. *See Wardlow*, 528 U.S. at 124. The fourth factor – the officers' prior experience with Appellant – is particular to Appellant, but can only corroborate, not provide, the necessary, concrete indicia that Appellant was involved in criminal behavior *when* he was stopped.

The Government argues that the second factor – walking quickly from the direction of an apartment building outside of which drugs could be bought toward an abandoned house – supports reasonable, articulable suspicion *because* the District Court concluded that it was not unreasonable for the officers to perceive Appellant's behavior as an "evasion of the police." Br. for Appellee at 20 & n.14; *see also id.* at 24-25, 27-28, 27 n.19. The Government additionally points to Appellant's bend and leg lift near the U-Haul, describing it as a furtive movement that "occurred immediately after" and "in response to" Appellant having "spied the police." *Id.* at 21; *see also id.* at 21-22, 22 n.16. The Government thus acknowledges that the probative value of these two circumstances rests on the District Court's conclusion that "it was not unreasonable for the officers to believe Defendant knew or suspected their [unmarked Dodge Ram] was a police vehicle." *Castle*, 53 F. Supp. 3d at 100. Because the record is devoid of the sort of evidence necessary to support this

conclusion, the Government's argument in support of reasonable suspicion necessarily collapses.

The critical role that a possible suspect's knowledge of police presence plays in determining whether arguably evasive action can be part of the totality of the circumstances supporting reasonable suspicion was made clear by the Supreme Court in *Wardlow*, 528 U.S. at 123-24. In that case, the Court held that, at least in areas of heavy narcotics trafficking, "[h]eadlong" flight is probative of wrong doing *if* it is both unprovoked and a result of "noticing the police." *Id.* at 124. In a similar vein, we have repeatedly emphasized that "furtive gestures are significant" in a reasonable, articulable suspicion analysis "*only* if they were undertaken in response to police presence, [a]nd a suspect can respond to the presence of a police officer only if he has recognized him as an officer." *Brown*, 334 F.3d at 1168 (alteration in original) (emphasis added) (citation omitted); *see also Edmonds*, 240 F.3d at 61; *Johnson*, 212 F.3d at 1316.

In support of its conclusion that Officers Olszak and Moseley reasonably believed that Appellant was aware of their presence in an unmarked truck and was acting to evade them, the District Court explained:

> [A]s the officers drove down Yuma Street, they saw Defendant walking very quickly from the direction of 133 Yuma Street, an address known for PCP distribution and criminal activity, toward a vacant backyard area, suggesting to the officers that he was trying to evade their presence. *The officers testified credibly that they patrolled the area so regularly that people in the neighborhood had come to recognize their vehicle and to expect such patrols. Indeed, Officer Olszak testified that people in the*

*neighborhood would act as "lookouts" and alert others to the presence of the police when they arrived in the area.* Furthermore, the street ended in a cul de sac, meaning that non-police traffic was less likely than on another street. *Therefore, it was not unreasonable for the officers to believe Defendant knew or suspected their vehicle was a police vehicle and was walking quickly in order to evade them.*

*Castle*, 53 F. Supp. 3d at 100 (emphases added). There are multiple problems with this analysis.

First, the District Court's factual finding that "people in the neighborhood" could recognize their truck as a police vehicle is questionable because it is based, at least in part, on specious testimony and speculation. Can anyone really take seriously Officer Olszak's assertion that he and Officer Moseley drove "the only Dodge Ram in the city"? Tr. of Motions Hearing at 75. And there was little evidence to suggest that the truck was otherwise particularly distinctive. There was nothing to suggest that the silver color of the truck was unique. And there is little reason to suppose that the truck's Florida license plates – the only arguably distinctive feature testified to by the officers – could be seen from any sort of distance, especially in the evening. Finally, we cannot help but note that the Government "did not seek to qualify [the police officers] as . . . expert[s] on public identification of police vehicles" or "establish a factual foundation for opinion testimony as [lay witnesses]." *See Johnson*, 212 F.3d at 1316. In other words, there are good reasons to question the District Court's factual finding that "people in the neighborhood" readily recognized the truck as a police vehicle.

But, even accepting this dubious assertion as not clearly erroneous, we are nonetheless convinced that the District

Court erred in equating the awareness of "people in the neighborhood" that the unmarked truck the officers drove was a police vehicle with a determination that the officers could reasonably believe that Appellant was aware of the officers' truck on the evening in question. The Government simply failed to put *any* evidence into the record that would support a reasonable officer in inferring that the indicia of police presence (the truck) had come to the attention of Appellant, let alone that Appellant reacted to the truck as a police vehicle.

In the face of this gap in the evidentiary record, the District Court's assessment of the reasonableness of the officers' inference amounts to a classic *non sequitur*. It does not follow from the fact that the unmarked truck was known in neighborhood as a police vehicle that Appellant was aware of its presence on the evening of his seizure and that the behavior witnessed by the officers was a reaction to that presence. Thus, the trial court's determination that the officers reasonably inferred that Appellant was evading them is due no weight. The failure of the Government to provide any evidence supporting the officers' inferences that Appellant knew of their presence and was acting in response to it should have led the trial court to find that these were not the sort of "specific reasonable inferences which [the officers were] entitled to draw from the facts in light of [their] experience," but rather amounted to no more than "inchoate and unparticularized suspicion[s] or 'hunch[es]'" to which no deference is owed. *Terry*, 392 U.S. at 27.

The District Court's assessment also defies legal authority. Our precedent makes clear, no matter how widely and readily recognizable the truck *may* have been as a police vehicle, a different type of evidence was necessary to support the inference that Appellant knew the police truck was present

and was responding to it. When putative police evasion or an alleged furtive gesture is what provokes police suspicion, our precedent requires that the Government proffer evidence, *apart from that behavior or gesture*, from which an officer could reasonably have inferred that the individual in question was aware of the recognizable police presence and was responding to it. *See Brown*, 334 F.3d at 1168; *Johnson*, 212 F.3d at 1316-17.

Our decision in *Edmonds* is instructive with respect to the sort of evidence that is necessary. There, as here, officers were driving an undercover car, a Crown Victoria that the seizing officer, Sergeant Feirson, testified was "regularly used to patrol the neighborhood and is easily identifiable by residents as a police cruiser." 240 F.3d at 57. As the officers made their way through the neighborhood in question, an area "notorious as [an] open air drug market[]," Feirson testified that he saw a man standing on the curb. *Id.* According to Feirson, when the man looked at the unmarked cruiser, "'his eyes got pretty big, and he immediately pivoted, turned away and he began to walk' – rapidly – towards a van located in the parking lot of [a] nearby . . . school." *Id.* The school was closed, and the parking lot was a known site for drug transactions. *Id.* There was someone sitting in the driver's seat of the van when the man entered it. *Id.* The man "had left the curb, Feirson believed, because he had recognized him and his companions as police officers." *Id.*

At this point, Sergeant Feirson decided to investigate. He got out of the unmarked car and, with his police badge prominently hanging from his neck, approached the van from the front looking through the windshield. *See id.* The Sergeant could see both the driver and the man who he believed had recognized him as a police officer through the van's windshield, and as he drew nearer, he saw the driver lean

forward making gestures that led Feirson to believe the driver was hiding something. *See id.* A seizure of the driver eventually led to the discovery of a gun under his seat. *Id.*

In undertaking a reasonable suspicion analysis, we considered both the furtive gestures of the driver and his passenger's "apparent attempt to evade the officers" when he left the curb. *Id.* at 60. And with respect to both, we had evidence from which Feirson could not only reasonably infer that he had been recognized as a police officer, but also evidence allowing Feirson to reasonably conclude that his being a police officer had come to the attention of both men *and* that their respective actions were in response to that recognition. Thus, with respect to the man on the curb, there was testimony that the undercover car was well known in an area notorious for drug sales. But in addition, Feirson testified that the man looked at the Crown Victoria and that "immediately upon observing" it, his eyes got big and he "hastened to the van to join its driver." *Id.* at 62; *see also id.* at 57. We found that "it was reasonable for Feirson's suspicions to be aroused in the first instance by [the man's] apparent flight and retreat" "immediately upon observing that [known police] vehicle." *Id.* at 62. And we were satisfied that because the Sergeant could see the driver "through the van's windshield, it [was] a fair inference that [the driver] in turn saw Feirson, perceived his badge, recognized him as a police officer, and reacted by making furtive gestures." *Id.*

The *Wardlow* opinion, addressing flight from the police, references similar evidence. There, it appears that the fact that the suspect had seen the police before he fled was never challenged. Nonetheless, the Supreme Court described the evidence from which it could reasonably be inferred that the officers from whom Wardlow fled were recognizable as police, that Wardlow was aware of their presence, and that his

flight was in response to that presence. The Court explained that the seizing officers, who were in uniform, were driving the last car of a four-car police caravan that was converging on an area known for heavy drug trafficking. 528 U.S. at 121. As the caravan passed Wardlow, one of those officers observed him "look[] in the direction of the officers" and then flee. *Id.* at 121-22.

In this case, the Government presented not an iota of similar evidence at either the motions hearing or during the trial. The officers simply failed to provide the trial judge with any testimony from which she could conclude that an objective officer in possession of the information Officers Olszak and Moseley had could reasonably or fairly infer that Appellant was aware of the police truck and was acting in response to it. As noted above, there was no testimony that either Appellant or the man with him ever so much as glanced in the direction of the truck – let alone reacted to it. The officers never testified, nor was there any factual finding, that either man turned his head toward the truck or pointed or gestured at it. Neither was there evidence that either man's pace or gait changed as the officers turned onto and drove down the street. In fact, Officer Moseley expressly testified that the men were already walking quickly when he saw them and pointed them out to Officer Olszak. Nor did the officers testify that either man changed direction or that Appellant altered the path he was on in order to enter the alleyway between the two houses. Neither officer even suggested that the men were ever, at any point, oriented so that they faced the truck as they walked. Indeed, because 144 Yuma is a higher numbered address than 133 Yuma, the testimony suggests that the men were oriented somewhat toward the cul-de-sac, walking diagonally away from the truck as it came from the intersection of First and Yuma Streets.

Furthermore, there is no evidence to indicate that the physical circumstances during the evening in question would have permitted Appellant to recognize the truck even if he had looked in its direction. Quite the contrary. The officers testified that: when the truck turned onto Yuma Street, Appellant and the truck were at opposite ends of a long city block; the truck's headlights were on and pointed in Appellant's direction – something that would not have changed as the officers drove down the street and that would have made it very difficult to identify a Florida license tag even as the truck moved closer to the cul-de-sac; and the truck was silver, not a color that would stand out, whether it was "dark," as the trial judge found, *Castle*, 53 F. Supp. 3d at 98, or "the dusk hour" with some street lights illuminated, as the officers testified, *see* Tr. of Trial at 88, 109 (July 16, 2014).

Moreover, Officers Olszak and Moseley provided no testimony from which they could reasonably infer that someone else who recognized the truck had alerted Appellant. Thus, unlike *Edmonds*, where a man on the street clearly noticed the undercover Crown Victoria and then pivoted and hastened over to the defendant, there was no testimony in this case that anyone on Yuma Street noticed the Dodge Ram and then approached or otherwise alerted Appellant or the man with him. And while Officer Olszak testified that the passenger side window of the truck was rolled down as Officer Moseley turned onto Yuma Street, neither he nor Officer Moseley said that they heard anyone yelling out "J.O. J.O." or any other calls or signals that experienced officers would have recognized as ones typically used by those involved in illegal narcotics sales when they wish to alert others to the presence of jump outs or undercover officers.

Nor, apparently, did the officers do anything to attract Appellant's attention as they drove down Yuma Street. There

was no testimony, for example, that they activated the truck's internal police lights, about which they testified, or otherwise announced their arrival in order to confirm or dispel their unsupported hunch that Appellant was walking quickly in an effort to evade them.

During oral argument before this court, Government counsel asserted that there was evidence that the Appellant and the truck were at some point in such close proximity that it would have been reasonable for the officers to infer that Appellant recognized the truck and responded by walking into the alleyway. *See* Recording of Oral Arg. 33:55-36:00. In other words, the Government essentially suggested that we look to the record for evidence apart from the District Court's findings of fact, that might support the conclusion that the officers could reasonably infer that Appellant was aware of and reacting to the truck's presence. As noted earlier, the law does not permit us to do this. *See Bailey,* 622 F.3d at 5 n.1. More fundamentally, Government counsel pointed to no record evidence to support this assertion, and cited none in its brief. Moreover, we can locate none in the motions hearing or trial records. Most importantly, the Government's argument is belied by Officer Moseley's uncontradicted trial testimony that, "[b]y the time we got to the corner of 144 Yuma Street when I stopped the truck, Mr. Castle was pretty close to the U-Haul," Tr. of Trial at 61 (July 16, 2014); *see also* Tr. of Motions Hearing at 26, which was about 125 feet from the street, Tr. of Motions Hearing at 87.

In its brief to this court, the Government repeatedly, broadly asserts that Appellant walked quickly toward 144 Yuma, into an alleyway between 144 Yuma and the house next door, and made furtive gestures, all "upon recognizing" or "in response to" or "immediately after he spied" the police. Br. for Appellee at 14, 18, 21, 22 n.16, 27 n.19, 29 & n.21.

But the Government cites no record evidence in support of these assertions. Rather, the Government relies on the District Court's conclusion that the officers reasonably inferred that Appellant was "walking quickly in order to evade them," *see id.* at 20 n.14; *see also id.* at 22 n.16 (referencing the District Court's conclusion that the officers reasonably inferred that Appellant bent down near the U-Haul and made a kicking movement with his leg in response to a known police presence). As explained above, the District Court's conclusion about what the officers could reasonably infer is without support in the record, contrary to governing precedent, and inconsistent with the dictates of logic. Consequently, it is due no weight.

During oral argument, in an effort to bolster its claim that Appellant was aware of the officers' presence, Government counsel also pointed us to two statements made by Officer Olszak. On direct examination, Officer Olszak testified: "We saw two guys towards the end of the street to the right kind of speed walk across the street. They were walking faster than at a normal pace when they made us out." Tr. of Motions Hearing at 22. Later on cross examination, Officer Olszak similarly asserted: "I think they knew we were the police when we first pulled in the block." *Id.* at 60. However, on further cross examination, Officer Olszak clarified that his assertion that Appellant "knew we were the police" was based solely on his conclusion that the unmarked truck was well known in the community as a police vehicle. *Id.* at 60-61. Officer Olszak then admitted that he had no other evidence supporting his suspicion that Appellant and the man with him knew that there was a police truck on Yuma Street. *See id.* at 61. Given this testimony, it is hardly surprising that the District Court did not cite the officer's unsupported assertions that Appellant "made out" or recognized the officers or their truck. Rather, the District Court relied solely on the officers'

testimony that their truck was well known in the neighborhood as a police vehicle. Then, based solely on the fact of neighborhood awareness that the truck was a police vehicle, the trial judge reached the implausible conclusion that the officers could reasonably infer that Appellant was aware of the truck's presence on Yuma Street on the evening in question and was responding to it. This conclusion is contrary to the facts in this case and to well-established law.

For the reasons explained above, we are constrained to reverse because the police officers had no reasonable, articulable suspicion justifying their stop of Appellant. *See, e.g.*, *Sprinkle*, 106 F.3d at 617-19 (an individual's presence in a neighborhood known for drug crimes, "huddl[ing]" with another person in a manner suggestive to the officers of a drug sale, and the individual's effort to hide his face and "dr[i]ve away as soon as the officers walked by" did not provide indicia of criminal activity adequate to support reasonable, articulable suspicion even when combined with the officers' knowledge of the individual's prior criminal record for narcotics offenses).

## CONCLUSION

The judgment of the District Court is reversed and the case is hereby remanded for further proceedings consistent with this opinion.

*So ordered.*

SILBERMAN, *Senior Circuit Judge*, dissenting: In my view, the majority opinion is quite unfortunate. It not only breaks with circuit precedent, it is quite confusing regarding the appropriate scope of review we should apply in reviewing district court factual determinations – particularly inferences drawn from historical facts.

To be sure, the overall question whether Officer Olszak had a reasonable suspicion to stop the Appellant is a question of law, although we must keep in mind it is deferential to officers because it asks only whether their actions are reasonable as police officers in light of their training and experience, not whether judges, putting themselves in the same position, would regard the actions of the defendant as suspicious. (Indeed, even our cases relied on by the majority uniformly affirm district courts' approval of investigative stops.) But – and this is a crucial point – subordinate determinations of historical facts as well as inferences from those historical facts are fact-findings for the district judge. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("We hold as a general matter determinations of reasonable suspicion . . . should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight *to inferences drawn from those facts by resident judges and local law enforcement officers*." (emphasis added)).

At the outset, I think even the undisputed facts in this case support the district court's determination that Officer Olszak had a reasonable suspicion justifying the seizure of Appellant Castle. Those facts are:

1. The officers knew that the 100 block of Yuma Street was a site of significant PCP distribution and use.

2. The officers patrolled the area three or four times a week in an unmarked – though distinctive – pickup

truck with Florida license plates. They testified (credibly, according to the district judge) that they patrolled the area so regularly that neighborhood people recognized their vehicle and some people would actually act as lookouts.

3.  Appellant and a companion were walking at a fast pace from 133 Yuma Street, an address known for PCP distribution and criminal activity.

4.  Appellant continued to walk down a narrow alley next to an abandoned house and bent over with one leg up in the air, sort of a backward kick, apparently in the manner as if one were dropping something, behind a U-Haul vehicle (what the majority refers to as "furtive movements").

5.  Then Appellant inexplicably walked back out of the alley, toward the officer, at which point Officer Olszak recognized him. Officer Olszak had seen Appellant "hang[ing] out" in front of 133 Yuma with known PCP dealers on a number of previous occasions, and he recalled several prior PCP-related arrests and incidents involving Appellant, including multiple occassions on which Appellant had attempted to evade arrest by fleeing from the police and to destroy evidence of PCP distribution and possession by pouring it on the ground.

*See United States v. Castle*, 53 F. Supp. 3d 95, 99-101 (D.D.C. 2014).

To justify a *Terry* stop, an officer need only "observe[] unusual conduct which leads him reasonably to conclude in light

of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The undisputed facts alone satisfy *Terry*'s standard. Appellant's conduct was quite unusual; it is not commonplace to walk into an alley leading to a vacant backyard, lean over behind an abandoned vehicle with one leg raised as if to drop something (or pick something up), and then immediately turn around and come back (notwithstanding the majority's assertion that it is "commonplace," Majority Op. at 5). In any event, even relatively "normal" activity can be sufficient to arouse an officer's suspicions. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). The suspicious conduct in *Terry*, for example, consisted only of men walking up and down a block several times, looking into a store window. 392 U.S. at 5-6. The Court carefully distinguished the arrest standard – probable cause that a crime has been committed – from the lower standard of reasonable suspicion necessary for an investigative stop.[1] *Id.* at 26.

The majority, nevertheless, asserts that Appellant's activity was "entirely mundane" and "not suspicious," (presumably as a matter of law?), Majority Op. at 5, but it reaches that conclusion by examining each factor alone without considering the effect

---

[1] While the analysis and holding in *United States v. Edmonds* is consistent with my view of this case, our opinion includes a stray comment suggesting *Terry* requires a belief that "the suspect is breaking, or is about to break, the law." 240 F.3d 55, 59 (D.C. Cir. 2001). But that is an overstatement. All *Terry* requires is that the officer suspect "criminal activity *may be afoot*." 392 U.S. at 30 (emphasis added). It is the probable cause standard that requires belief that a crime has been, is being, or is about to be committed. *Id.* at 26; *id.* at 35 (Douglas, J., dissenting).

4

when they are all combined.  While each individual factor may be "susceptible of innocent explanation, and some factors are more probative than others[, t]aken together," *Arvizu*, 534 U.S. at 277, they can suffice to form the particularized and objective basis required by *Terry*.  *See also United States v. Sokolow*, 490 U.S. 1, 8 (1989) ("In evaluating the validity of a [*Terry*] stop . . . , we must consider 'the totality of the circumstances – the whole picture.'" (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).  The additional circumstances here do just that.

First, the stop occurred in a high-crime area.  The majority discounts this factor by noting that the high-crime nature of a neighborhood is merely a "contextual consideration[]" that cannot demonstrate reasonable suspicion.  Majority Op. at 18.  But "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).  I do not disagree that location *alone* cannot be determinative, but it can be used in conjunction with other factors – such as the Appellant's odd behavior – to establish reasonable suspicion, as is the case here.

What is more, once Officer Olszak recognized Appellant, Castle's behavior that night – walking quickly from the PCP house down the alley, bending over as if he was dropping something, and then turning around and walking back toward Officer Olszak – looked particularly suspicious in light of his history.  Officer Olszak knew Appellant hung around the PCP house with known PCP dealers, and knew Appellant had several prior PCP-related arrests, including incidents in which Appellant attempted to evade police and destroy evidence.  At that point, it was not unreasonable for Officer Olszak to infer Appellant's

odd behavior was consistent with how he had behaved in the past when in possession of PCP. *See United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995) (holding that "recent relevant criminal conduct . . . is a permissible component of the articulable suspicion required for a *Terry* stop," and collecting cases to that effect).

Again, the majority discounts this factor as merely corroborative, Majority Op. at 18, but that is exactly how Officer Olszak used this piece of information. His suspicions were not aroused solely because of Appellant's criminal history (he was not "round[ing] up the usual suspects," *id.* at 16 (quoting *United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006)), but because of that criminal history in the context of the current situation: Olszak observed a man whom he knew had previously been arrested for PCP-related crimes, who attempted to destroy evidence and flee from police, quickly walk away from a building known for PCP distribution, down a deserted alley to a vacant lot, and appear to drop something behind an abandoned U-Haul truck, then immediately turn around and come back. *Compare United States v. Gordon*, 722 F.2d 112, 114 (5th Cir. 1983) (per curiam) (reasonable suspicion to stop a motor home existed where officers identified driver as a member of a drug smuggling group, knew the motor home was registered to the same address as a motor home seized in an earlier drug arrest, and knew the group's smuggling operations involved the use of motor homes). In other words, Officer Olszak did in fact "pair . . . knowledge [of the Appellant's criminal record] with some more concrete factors to demonstrate that there [is] a reasonable suspicion of *current* criminal activity." Majority Op. at 17 (quoting *United States v. Foster*, 634 F.3d 243, 247 (4th Cir. 2011)) (internal quotation marks omitted) (third alteration in original).

The majority emphasizes that Appellant's actions cannot be construed as furtive unless the government shows that Appellant and his companion recognized the police vehicle before Appellant walked down the alley.  I think Appellant's actions, paired with the circumstances, were unusual enough that reasonable suspicion existed regardless of whether the actions were prompted by knowledge of police presence, for the above reasons.

However, even were evidence of Appellant's recognition of police presence necessary to satisfy *Terry*, that standard is met here.  The majority insists the government did not provide sufficient evidence, describing a great number of hypothetical pieces of evidence that would more clearly demonstrate Appellant or his companion recognized the officers' presence. Majority Op. at 4-5, 24-26.  I concede the government made no showing that Appellant (or anyone else) pulled out a megaphone and announced to the neighborhood "J.O. J.O.," or anything of that nature.  But the government showed "a sufficient basis for the officers to believe they had been recognized." *See United States v. Brown*, 334 F.3d 1161, 1168 (D.C. Cir. 2003).  While that may sometimes take the form of very direct, clear evidence – the police announcing themselves, as in *United States v. Johnson*, 212 F.3d 1313, 1315 (D.C. Cir. 2000), or officer testimony that the individual's eyes grew large at the sight of police, as in *United States v. Edmonds*, 240 F.3d 55, 57 (D.C. Cir. 2001), for example – as the majority seems to demand here, that is not always the case.

The majority's own authority makes that point.  In *Brown*, for example, the only evidence the government had of knowledge of police presence was circumstantial – the police were in uniform, their car was marked, another passenger had exited the vehicle several minutes prior, and one officer carried

a lit flashlight as he approached – and the court acknowledged that the "furtive movements" the officers observed could have been "merely a coincidence." 334 F.3d at 1168. After all, there was no evidence the vehicle's occupants actually had observed these facts (indeed, they allegedly were distracted by "amorous activity," *id.* at 1168 n.5). Nevertheless, we held that "the possibility of such a coincidence d[id] not negate the officers' reasonable suspicion and fear, nor d[id] the fact that the passenger's behavior did not necessarily indicate criminal activity or prospective danger." *Id.* at 1168.

So too here. There was sufficient circumstantial evidence to allow Officer Olszak to reasonably conclude his presence had been noted, and Appellant's actions constituted suspicious "furtive movements." The district court found that the officers' distinctive truck (with Florida license plates) was well-known in the neighborhood as a police vehicle, and that it was not unusual for people to act as lookouts and alert others to police presence. Additionally, traffic on Yuma Street is sparse given that it ends in a cul-de-sac, making the presence of any vehicle noticeable. In light of those circumstances, the district court concluded "it was not unreasonable for the officers to believe [Appellant] knew or suspected their vehicle was a police vehicle," and that his walking "very quickly from the direction of 133 Yuma Street toward the vacant back yard area, sugges[ted] *to the officers* that he was trying to evade their presence." *Castle*, 53 F. Supp. 3d at 100 (emphasis added). That is fact-finding based on inferences from the historical facts and bolstered by a credibility determination. The majority complains that "equating the awareness of 'people in the neighborhood' that the unmarked truck the officers drove was a police vehicle with a determination that the officers could reasonably believe that Appellant was aware of the officers' truck on the evening in question," is a "dubious assertion." Majority Op. at 20-21. But

this is nothing more than the majority quarreling with an inference which the officers and the district court were entitled to draw, and we, as an appellate court, must respect.

*****

The important doctrinal point that divides me from the majority is the proper scope of review of the district court's determination. It is black letter law that inferences drawn from historical fact are part and parcel of a district judge's fact-finding – which may be disturbed by an appellate court only on a determination of clear error. In my view, the majority improperly cloaks an attack on the district judge's fact-finding as a question of law. Compounding the problem, the majority refuses to say exactly what kind of error it has supposedly identified, instead declaring the district court's conclusion "without support in the record" (suggesting clear factual error), "contrary to governing precedent" (suggesting legal error), "and inconsistent with the dictates of logic" (suggesting some other type of error entirely?). Majority Op. at 27. Thus, the majority at pages 5-6 and 9-10 conflates the roles of the police officer, the district judge, and the court of appeals. The overall question as to whether the officer's stop of an individual is reasonable is clearly a question of law – but it is a question of law over which the district court and we defer to the police officer's inferences. Subordinate to that overall legal question are questions of historical fact and inferences to be drawn from those facts. As an appellate court we must respect the district court's resolution of those questions unless there is clear error. *Ornelas*, 517 U.S. at 699-700.

The result of the court's opinion, I fear, will be immense confusion on the part of district courts attempting to interpret

and apply this Delphic – and seemingly inconsistent with circuit precedent – opinion.  I respectfully dissent.