# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 30, 2020        Decided April 17, 2020

No. 18-3093

UNITED STATES OF AMERICA,
APPELLEE

v.

ANTWAN C. DELANEY,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cr-00082-1)

———

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Tony Axam Jr.*, Assistant Federal Public Defender, entered an appearance.

*Daniel J. Lenerz*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman* and *Chrisellen Kolb*, Assistant U.S. Attorneys.

Before: TATEL, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case illustrates the difficulties inherent in applying the Fourth Amendment's generalized prohibition against unreasonable searches and seizures to the vagaries of everyday police activity. After being charged as a felon in possession of a firearm, Antwan Delaney moved to suppress evidence obtained during a search of his vehicle on the ground that the seizure preceding the search violated the Fourth Amendment. Finding it a close call, the district court denied the suppression motion. Although we too find the question close, we reach the opposite conclusion: when officers seized Delaney, they lacked the requisite suspicion to justify the stop, meaning the subsequent search violated the Fourth Amendment.

**I.**

The following comes from the district court's detailed factual findings, which, with two minor exceptions noted below, neither Delaney nor the government challenges.

On December 31, 2017, officers Richard Willis and Jason Boockholdt were patrolling a residential area east of the Anacostia River. They conducted the patrol in uniform and in a marked police cruiser, with Willis driving and Boockholdt riding shotgun. The officers "were specifically patrolling the area for New Year's Eve celebratory gunfire or other crime." Hearing Tr. 71 (July 10, 2018).

Shortly after midnight, the officers heard "repeated gunfire in multiple directions, including shots that the officers believed to be close by." Hearing Tr. 9 (July 12, 2018). The officers began canvassing the immediate area to determine the location of the shots. They first stopped at an alley, exiting the cruiser to investigate. The officers saw no one there but, while looking

about, heard "seven to eight gunshots coming from multiple directions," a "few" of which "sounded particularly close by." *Id*. at 9–10. The officers got back into their cruiser to "chas[e]" or "attempt to follow and investigate the sounds." *Id*. at 10.

After driving "for approximately one minute, reversing direction[,] and turning a few times," they pulled into a "narrow parking lot." *Id*. at 6, 10. Activating the cruiser's "take-down light, a spotlight that enabled them to better observe the area," the officers encountered a line of parked cars. Hearing Tr. 72 (July 10, 2018). One, a Jeep backed-in "close to an adjacent building and/or cement block," was occupied by two individuals: Delaney, sitting in the driver's seat, and his companion, Jalisa Boler, sitting in the passenger seat. *Id*. at 73. As the officers pulled into the lot, Delaney and Boler "beg[an] to kiss one another intensely." *Id*. at 72.

The officers stopped their cruiser near the parking lot's entrance, "more than 3 feet away from the nose of the Jeep." *Id*. at 72–73. Although "the marked police car did not completely block the Jeep from exiting the parking lot, . . . it would have taken some maneuvering, a number of turns for the Jeep to get out of the parking lot." *Id*. at 73.

The officers exited their cruiser and approached the Jeep with their weapons holstered. Willis approached the passenger side, and Boockholdt approached the driver side. Meanwhile, Delaney and Boler continued to kiss passionately, with Delaney "star[ing] at the police officers while kissing"—a reaction Willis found "odd." *Id*. "Neither officer," however, "observed either of the passengers make any furtive gesture." *Id*.

As Willis reached the Jeep's passenger-side window, Delaney and Boler stopped kissing and raised their hands. Willis then asked if they had heard gunshots. One of the

passengers—"it's not clear who"—replied that they had and then "said something to the effect of 'we were just kissing.'" *Id*. at 73–74. Willis replied, "I can see that," *id*. at 74, to which one of the passengers—again, it's unclear who—stated "I apologize, sir; I apologize," Hearing Tr. 15 (July 12, 2018).

While Willis questioned the passengers, Boockholdt surveyed the parking lot with a flashlight. Returning to the Jeep, Boockholdt instructed Delaney to "pop the door real quick," to which Delaney replied, "you got it." Hearing Tr. 74 (July 10, 2018). Boockholdt then opened the door himself and shouted, "he's got one, 95," signaling to Willis the presence of a firearm. *Id*. at 75. After a brief scuffle, the officers detained Delaney. A subsequent search of the Jeep uncovered a handgun under the passenger seat and spent casings on the passenger seat and outside both sides of the Jeep.

A federal grand jury charged Delaney, who had previously been convicted of a felony, with possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). Arguing that his seizure violated the Fourth Amendment, Delaney moved to suppress the firearm recovered from the Jeep. The district court held an evidentiary hearing on the motion, at which Willis testified and the government introduced a handful of exhibits, including body-camera footage that captured the officers' actions from the time they left the alley up and through Delaney's arrest. After hearing the testimony and "reviewing the exhibits in detail, particularly the body camera footage," the district court made the above factual findings. Hearing Tr. 2–3 (July 12, 2018).

It then turned to the merits of Delaney's motion. The district court first found that no seizure occurred when the officers drove into the parking lot and activated their take-down light because, "[c]onsidering all of the circumstances

surrounding the officers' entrance into the parking lot, I do not find that a reasonable person in the defendant's position would feel not free to leave the scene." *Id*. at 8. In the alternative, the district court found that "even if a seizure did occur at the moment that the officers parked their vehicle in the parking lot," no Fourth Amendment violation occurred because, at that time, the officers had "a reasonable, articulable suspicion that criminal activity may be afoot." *Id*. at 8, 12. The district court next rejected Delaney's argument that a Fourth Amendment violation occurred "when [the officers] exited their vehicle and approached the Jeep," explaining that such conduct fell short of a seizure and that, in any event, the officers had reasonable suspicion to stop Delaney. *Id*. at 13, 14. Finally, the district court found that "an investigatory stop occurred when Officer Boockholdt directed Mr. Delaney to open the driver-side door" and that reasonable suspicion existed to justify the stop. *Id*. at 17. The district court therefore denied Delaney's motion to suppress.

Because the government refused to offer Delaney a conditional plea that would have allowed him to appeal the district court's ruling, the parties agreed to a stipulated trial, at which the district court found Delaney violated 18 U.S.C. § 922(g)(1). The district court then sentenced Delaney to a term of forty-six months imprisonment, and this timely appeal followed.

## II.

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. amend. IV. This case concerns the latter protection.

A Fourth Amendment seizure occurs "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742

6

F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). A show of authority sufficient to constitute a seizure occurs where "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business," *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotation marks omitted), or, put another way, where "a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In making that determination, courts consider the totality of the circumstances, including "whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled." *United States v. Castle*, 825 F.3d 625, 632–33 (D.C. Cir. 2016) (internal quotation marks and alterations omitted). The person challenging the seizure "bears the burden of demonstrating that he was seized." *Id*. at 633.

Although the Fourth Amendment generally requires that officers have probable cause and a warrant to seize an individual, they need neither probable cause nor a warrant to "briefly detain a citizen" where they "ha[ve] a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). To "seize[] a person on less than probable cause," "a police officer . . . must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Castle*, 825 F.3d at 634 (internal quotation marks and citations omitted). The government bears

the "burden to provide evidence sufficient to support reasonable suspicion." *Id*.

Where, as here, a district court denies a defendant's suppression motion, we review de novo "claims regarding whether and when a seizure occurred" as well as the "district court's ultimate determination of whether a police officer had the reasonable, articulable suspicion . . . necessary to legally effectuate" the stop. *Castle*, 825 F.3d at 632 (internal quotation marks and alteration omitted). And when a district court makes factual findings, as was the case here, we must "take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by [district court] judges." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Significantly for our purposes, the government raises no clear error challenge to the district court's findings. That matters because although aspects of the testimony and body-camera footage might be thought to suggest that the officers had a more specific idea of the approximate location from which some of the shots originated, that is not the only reasonable interpretation of the record, and the district court made no findings to that effect. Rather, the district court found only that the officers "attempt[ed] to follow and investigate the sounds" and encountered Delaney "in close vicinity . . . to the gunfire." Hearing Tr. 10–11 (July 12, 2018). Indeed, the district court expressed skepticism that the record could support a finding that the officers knew from which direction even the nearest shots came, explaining in a colloquy with Delaney's counsel that the officers "d[id]n't know exactly where [the shots] [we]re." Hearing Tr. 110 (July 10, 2018); *see also id*. at 30 (Officer Willis testifying that he "can't say" where the "particularly loud" shot came from). For his part, Delaney does raise a clear error challenge, arguing—albeit in a footnote—

that the district court erred by finding that he made two separate apologies to the officers, but we see no discrepancy between Delaney's and the district court's account of the relevant incident. *Compare* Appellant's Br. 15 ("The body worn camera video shows one apology, from Mr. Delaney. . . . 'I apologize, sir. I apologize'"), *with* Hearing Tr. 15 (July 12, 2018) (finding that one of the passengers stated "I apologize, sir; I apologize").

Accordingly, we must determine, in light of the district court's findings, when the officers seized Delaney and whether, at that point, they possessed reasonable suspicion to do so. We address each question in turn.

**A.**

Our first task is to pinpoint the time of the stop. The district court found that the seizure occurred when Boockholdt ordered Delaney to open the driver-side door. Delaney, in turn, contends that the stop happened much earlier—namely, when the officers parked their cruiser within a few feet of the Jeep and when Delaney submitted to that show of authority by staying put. We agree with Delaney.

The officers' conduct on entering the parking lot amounted to a "show of authority" sufficient to effectuate a stop. *Hodari D.*, 499 U.S. at 626. In *United States v. Goddard*, 491 F.3d 457 (D.C. Cir. 2007) (per curiam), we explained that although "the presence of a police car might be somewhat intimidating," "[b]y itself, [it] is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave." *Id*. at 461 (internal quotation marks omitted). That said, we recognized that "additional circumstances" can transform an otherwise consensual police-citizen encounter into a stop. *Id*. at 462. Here, several such "additional circumstances" beyond the mere "presence of [the officers'] car" in the parking lot, *id*. at 461, "would have communicated to a reasonable person" in

Delaney's position "that he was not at liberty to ignore the police presence and go about his business," *Bostick*, 501 U.S. at 437 (internal quotation marks omitted).

First, the officers parked their cruiser a little over "[three] feet away from the nose of the Jeep," which "was backed up close to an adjacent building and/or cement block," such that the Jeep would have had to execute "a number of turns . . . to get out of the parking lot." Hearing Tr. 73 (July 10, 2018). Such "restrict[ions on] . . . movement[]" are highly suggestive of a stop. *Castle*, 825 F.3d at 632 (internal quotation marks omitted). In *United States v. Johnson*, 212 F.3d 1313 (D.C. Cir. 2000), for example, we explained that "blocking a vehicle can be the kind of application of physical force that constitutes a seizure." *Id*. at 1317. Although no stop occurred in that case because the officer parked his cruiser "about 25 feet away from [the accused's] car, hardly close enough to block it," we observed that "if [the accused's] car had been blocked, he would have been stopped." *Id*. Similarly, in *Goddard*, we found that no stop occurred where officers parked their cruiser "fifteen to twenty feet away from [a] group of men" in part because "nothing in the record indicate[d] that the officers . . . impeded [the accused's] movement." 491 F.3d at 461. Here, by contrast, the officers parked their cruiser just a few feet away from the Jeep, "imped[ing] [Delaney's] movement." *Id*.

Second, upon entering the parking lot, the officers directed their cruiser's take-down light on the Jeep. Such aptly named lights "are designed to illuminate the stopped car as well as to provide protection for an officer by blinding and disorienting the car's occupants if they look back at the squad car." *United States v. Shelby*, 234 F.3d 1275, at *1 n.1 (7th Cir. 2000) (unpublished table decision). Given "that a reasonable person placed in a spotlight" would feel unfree to leave, the use of such lights is suggestive of a stop. *United States v. Packer*, 15 F.3d

654, 657 n.3 (7th Cir. 1994); *see also United States v. Tanguay*, 918 F.3d 1, 7 (1st Cir. 2019) (noting that the use of take-down lights "comes close to communicating some type of command").

Finally, "the time and place of the encounter" are indicative of a stop. *Castle*, 825 F.3d at 632 (internal quotation marks omitted). As the Seventh Circuit observed, when a police encounter occurs "at night" and "in a dark alley," a reasonable person would feel unfree to "ignore the police presence." *United States v. Smith*, 794 F.3d 681, 684–85 (7th Cir. 2015). So too here: the officers encountered Delaney at night in a dimly lit, "narrow parking lot," Hearing Tr. 6 (July 12, 2018)—factors suggestive of a stop.

Taken together, then, the officers' conduct—pulling into the narrow parking lot at night; training the take-down light on the Jeep; and, most importantly, parking their cruiser within a few feet of the Jeep's nose—amounted to a "show of authority" that "would have communicated to a reasonable person" in Delaney's position "that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 434 (internal quotation marks omitted). The government's arguments to the contrary are unpersuasive.

The government first contends that Delaney could have "maneuver[ed] his car to exit the lot" or else "walk[ed] away from . . . the encounter." Appellee's Br. 22, 25 (internal quotation marks omitted). But "officers need not totally restrict a citizen's freedom of movement in order to convey the message that walking away is not an option." *Smith*, 794 F.3d at 686. To be sure, the district court found that "the marked police car did not completely block the Jeep from exiting the parking lot," Hearing Tr. 73 (July 10, 2018), but "it still seems unlikely that a reasonable person" in Delaney's position,

"placed in a spotlight and knowing that he was the focus of police attention[,] would believe that he was free to maneuver his car out of the parking space," *Packer*, 15 F.3d at 657 n.3, much less leave the Jeep by walking away. Any such "attempt to leave the scene would be so obviously likely to prompt an objection from the officer," the Supreme Court explained in *Brendlin v. California*, 551 U.S. 249 (2007), that no reasonable person "would feel free to leave in the first place." *Id*. at 257.

What's more, although courts have consistently, and with good reason, recognized "that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), such encounters also pose real dangers for the individual stopped, especially were the individual to engage in action that officers would likely perceive to be evasive or threatening, *see e.g.*, *Jackson v. District of Columbia*, 83 F. Supp. 3d. 158, 162 (D.D.C. 2015) (describing incident in which an officer broke plaintiff's arm during a routine traffic stop). Thus, a reasonable person in Delaney's position—encountering officers late at night in a dimly lit and narrow parking lot, his exit partially blocked, a light blinding his eyes, and gunshots sounding all around—would "expect that . . . police officer[s] at the scene . . . will not let [him] move around in ways that could jeopardize [their] safety." *Brendlin*, 551 U.S. at 258.

The government next argues that, regardless of whether the cruiser restricted Delaney's movement, its location should play no part in the stop analysis because the district court "found that the officers stopped their vehicle 'in a natural parking position, given the narrow parking lot.'" Appellee's Br. 28 (quoting Hearing Tr. 6 (July 12, 2018)). Relying on cases concerning drug interdictions on public transportation, the government insists that restrictions on suspects' movement

are of no matter where, as the government claims is the case here, an officer's "position is virtually compelled by the location of [an] interview." *Id*. at 29 (quoting *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990)).

The government's reliance on drug-interdiction cases is misplaced. Those cases are premised on the notion that "[l]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Bostick*, 501 U.S. at 434 (internal quotation marks omitted). But that principle caries little weight where, as here, police conduct "lack[s] a traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of the police officer." *United States v. Jones*, 678 F.3d 293, 300 (4th Cir. 2012). By "pull[ing] the police cruiser to a stop" in the parking lot's exit lane and activating their take-down light, the officers made clear that "this was not a routine encounter, but one targeted at [Delaney]." *Id*. at 300–01. Thus, however "natural" the cruiser's stopping position, the officers' "targeted" conduct toward Delaney indicated that he was not free to ignore their presence.

Having established that the officers' conduct amounted to a show of authority sufficient to effectuate a stop, we must next determine at what moment Delaney submitted to that show of authority. In *Brendlin*, the Supreme Court explained that "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." 551 U.S. at 262. In that case, the Court held that a passenger in a moving car subjected to a traffic stop "had no effective way to signal submission while the car was still moving on the

roadway, but once it came to a stop he could, and apparently did, submit by staying inside." *Id*. The same holds true here: in response to the officers' show of authority, Delaney did not "get[] up to run away" but, instead, "submit[ted] by staying inside" the Jeep. *Id*.

Likening this case to *Johnson*, where we found that no seizure occurred until the accused complied with an officer's order to raise his hands in the air, 212 F.3d at 1315, the government contends that no submission occurred here until Delaney stopped kissing Boler and raised his hands. But the government overreads both Delaney's kissing and our opinion in *Johnson*. As to the former, the kissing does not negate Delaney's submission because "a defendant does not have to remain frozen in order to submit"; rather, a stopped individual submits by "remaining seated in his car when the police vehicle approache[s]"—precisely what Delaney did here. *United States v. Stover*, 808 F.3d 991, 998 (4th Cir. 2015). As for *Johnson*, the accused in that case ignored the officer's express order and, instead, made "furtive gestures" that "were the very opposite of complying with [the] order." 212 F.3d at 1316. Here, by contrast, Delaney neither ignored express orders nor "ma[de] any furtive gesture[s]." Hearing Tr. 73 (July 10, 2018). Rather, as in *Brendlin*, Delaney complied with the officers' generalized show of authority "by staying inside" the Jeep and "by not getting up to run away." 551 U.S. at 262.

For these reasons, then, a seizure occurred when the officers pulled into the parking lot, partially blocked Delaney's vehicle, and activated their take-down light.

**B.**

With the timing of the seizure established, we turn next to whether, at that point, the officers possessed "specific and articulable facts" to "support a reasonable and articulable

suspicion that [Delaney] [wa]s engaged in criminal activity." *Castle*, 825 F.3d at 634 (internal quotation marks omitted).

Recall that the district court concluded that "even if a seizure did occur at the moment that the officers parked their vehicle in the parking lot," no Fourth Amendment violation occurred because, at that time, the officers had "a reasonable, articulable suspicion that criminal activity may be afoot." Hearing Tr. 8, 12 (July 12, 2018). The district court found that four factors, viewed together, gave rise to reasonable suspicion, namely: (1) the officers "encountered Mr. Delaney and Ms. Boler within one city block of where the officers heard repeated and close-by gunshots"; (2) they "encountered Mr. Delaney and Ms. Boler approximately one minute after hearing the sound of nearby gunshots"; (3) the officers "saw no one else in the parking lot or while driving from the first parking lot where they heard the shots"; and (4) "Mr. Delaney and Ms. Boler exhibited very strange behavior when the officers approached them in their marked police vehicle with a spotlight on and parked next to them." *Id*. at 12. Although Delaney suggests in passing that the officers saw other people en route to the parking lot, Appellant's Br. 29, he raises no clear error challenge on that ground. The question, then, is whether, in view of the district court's findings, the government has carried its burden of establishing reasonable suspicion. Although a close call, we conclude that it has not.

To be sure, Delaney's proximity to "close-by gunshots," Hearing Tr. 12 (July 12, 2018), goes some way toward establishing reasonable suspicion. But the Supreme Court made clear in *Illinois v. Wardlow*, 528 U.S. 119 (2000), that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id*. at 124. And here, any inferences of suspicion that the

officers drew from encountering Delaney soon after hearing nearby gunshots are undermined by the government's failure to identity "specific and articulable facts" supporting the officers' estimation of where the various shots came from. *Castle*, 825 F.3d at 634 (internal quotation marks omitted).

As noted, the district court found that while in the alley, the officers heard "seven to eight gunshots coming from multiple directions," a "few" of which "sounded particularly close by." Hearing Tr. 9–10 (July 12, 2018). The officers then tried "to follow and investigate the sounds." *Id*. at 10. But the district court made no findings to suggest that the officers knew the approximate location from which the various shots originated. There are no findings, for example, that the officers heard the gunshots coming from the direction of the parking lot or that someone directed the officers that way. *Cf. United States v. Bolden*, 508 F.3d 204, 205 (5th Cir. 2007) (finding reasonable suspicion existed in part because a pedestrian told officers that shots emanated from "around the corner"). Indeed, quite the opposite: the district court explained that the officers "d[id]n't know exactly where [the shots] [we]re." Hearing Tr. 110 (July 10, 2018).

Compare that to our decision in *United States v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003), upon which the government principally relies. There, we held that reasonable suspicion existed to stop, and eventually search, "the car in which [the accused] was sitting" in part because officers received "a report that gunshots had been fired" from the very "parking lot in which [the accused's] car was parked." *Id*. at 1165. Here, by contrast, the district court's findings indicate that the officers pulled into the parking lot—and thus stopped Delaney—on nothing more than an "unparticularized suspicion or 'hunch'" about the origins of the shots. *Terry*, 392 U.S. at 27. But "[e]ven inspired hunches do not invest the police with the authority to

stop people at will." *United States v. Ienco*, 182 F.3d 517, 524 (7th Cir. 1999) (internal quotation marks omitted).

True, the district court found that the officers saw Delaney before they saw anyone else. But absent findings substantiating the officers' estimation of where the shots came from, that fact does little to change the reasonable suspicion calculus because the corresponding inference—that Delaney might be the source of those shots—no longer follows. Again, a comparison to *Brown* illustrates. There, the officers discovered the accused sitting "inside one of the only two occupied cars in the lot," the precise spot where gunshots had reportedly been fired, which "enhanced the probability that criminal activity had been committed, or was being committed, by someone inside one of the . . . occupied cars." 334 F.3d at 1165. Here, the officers merely encountered Delaney in "close vicinity" to where they estimated the shots originated from. Hearing Tr. 11 (July 12, 2018). Moreover, the officers were patrolling a populated residential area shortly after midnight on New Year's Eve, a time when one would have expected other folks to be out and about celebrating. Nothing differentiated Delaney from any other individual that the officers might have encountered nearby, except that the officers saw him first. *Cf. Bolden*, 508 F.3d at 206 (finding reasonable suspicion existed in part because officers encountered the defendant fleeing from the direction of where gunshots emanated). On the government's account, the officers would have had reasonable suspicion to stop any and every individual they encountered in "close vicinity" to the shots. Hearing Tr. 11 (July 12, 2018). That, however, "describe[s] a very large category of presumably innocent" people and, accordingly, cannot "justify a seizure." *Reid v. Georgia*, 448 U.S. 438, 441 (1980).

That leaves the kissing, which the district court characterized as "strange" and "suspicious." Hearing Tr. 11, 16

(July 12, 2018). "[N]ervous, evasive behavior is," of course, "a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. But not all reactions to seeing the police are suggestive of criminal behavior. *See United States v. Jones*, 584 F.3d 1083, 1087 (D.C. Cir. 2009) ("Merely walking away, even quickly as appellant did, upon the arrival of the uniformed police officer would not provide articulable suspicion of criminal wrongdoing."). And necking, especially shortly after midnight on New Year's Eve, hardly suggests that "criminal activity was afoot." *Terry*, 392 U.S. at 30. In addition, the district court expressly found that Delaney made no furtive gestures in the presence of the officers. *Cf. Brown*, 334 F.3d at 1168 (finding reasonable suspicion existed in part because officers observed accused's furtive movements in parked vehicle). And neither the district court nor the officers found Delaney's conduct, including the kissing, "evasive." *Wardlow*, 528 U.S. at 124. Accordingly, Delaney's perfectly innocent, if odd, reaction to the police provides scant support for the officers' reasonable suspicion determination.

We are sensitive, however, to the Supreme Court's warning against "excessively technical dissection of the factors supporting" reasonable suspicion. *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (internal quotation marks omitted). Accordingly, stepping back and "consider[ing] the whole picture," *id.* (internal quotation marks omitted), to ensure we do not miss the proverbial forest for the trees, we see the following: soon after hearing nearby gunfire, the officers encountered the Jeep's occupants in close vicinity to where the officers estimated the shots emanated from. The officers saw no one else before coming across the Jeep and witnessed the Jeep's occupants engage in odd but non-evasive conduct.

Although such evidence surely indicates that "criminal activity was afoot" broadly, *Terry*, 392 U.S. at 30, it raises no

"suspicion that the particular individual being stopped"—that is, Delaney—"[wa]s engaged in wrongdoing," *United States v. Cortez*, 449 U.S. 411, 418 (1981). "'Th[e] demand for specificity in the information upon which police action is predicated," the Supreme Court explained, "is *the central teaching of this Court's Fourth Amendment jurisprudence*,'" *id*. (quoting *Terry*, 392 U.S. at 21 n.18), and specificity is precisely what is missing here. The government has therefore failed to carry its burden of establishing "a reasonable and articulable suspicion that [Delaney wa]s engaged in criminal activity." *Castle*, 825 F.3d at 634 (internal quotation marks omitted).

## III.

For the foregoing reasons, the officers violated the Fourth Amendment when they seized Delaney because they lacked reasonable suspicion to justify the stop. The government offers no argument as to why, were we to find that a Fourth Amendment violation occurred, an exception to the exclusionary rule would apply. We therefore vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*So ordered*.