# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 20, 2020          Decided May 21, 2021

No. 19-3050

UNITED STATES OF AMERICA,
APPELLEE

v.

WALTER MABRY,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cr-00138-1)

---

*Tony Axam Jr.*, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was *A. J. Kramer*, Federal Public Defender.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Elizabeth Trosman*, *John P. Mannarino*, and *Thomas Martin*, Assistant U.S. Attorneys.

Before: TATEL and GARLAND,[*] *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Walter Mabry was charged with several firearm- and drug-related offenses. He moved to suppress evidence obtained after he fled from an encounter with the police. The United States District Court for the District of Columbia denied his motion. The court reasoned Mabry had not been seized before fleeing, so his rights under the Fourth Amendment of the United States Constitution were not implicated. Mabry argues he had been seized because, before fleeing, he had submitted to a show of authority by the police. The Government defends the reasoning of the district court and also argues that any submission was feigned and is therefore irrelevant.

We hold the totality of the circumstances show the officers' conduct constituted a show of authority to which Mabry had submitted. Therefore, we reverse the district court's denial of Mabry's motion to suppress.

## I. Background

On April 21, 2018, shortly after 10:00 pm, three officers of the Metropolitan Police Department drove in an unmarked car to 37th Place S.E. They were members of the Department's Crime Suppression Team, which "focuses on guns and drugs

---

[*] Then-Judge Garland was a member of the panel at the time this case was submitted but did not participate in the final disposition of the case.

in high-crime areas;" each wore a full uniform and a body camera. They were not responding to a report of criminal activity. Rather, they were patrolling the area because it was known to be one where gun- and drug-related crime was prevalent. The officers "saw three men hanging out on the sidewalk.... They didn't see them doing anything," but "nevertheless got out of the car to make contact and to talk to [them]."

As the officers neared, one of the three men began to walk away; Officer Goss approached him as he did. Mabry and the third man stayed where they were on the sidewalk in front of a fence. Officer Volcin approached Mabry and Officer Tariq approached the third man. The man who had tried to walk away became irate as Officer Goss spoke with him, so Officer Tariq walked over to help and patted the man down. Meanwhile, Officer Volcin stayed with Mabry – who presumably could see what was happening a few feet away – and the third man. Officer Volcin asked the third man for permission to pat him down. Although the body-camera footage does not capture an audio response, it shows that Officer Volcin proceeded to pat the third man down with one hand while holding a flashlight in his other. Seeing this, Mabry raised his shirt and said, "I've got nothing on me," and "you have no probable cause to search me."

At that point Officer Volcin noticed Mabry was carrying a satchel secured by a strap across his body. According to Officer Goss, his team "ha[d] run into many individuals who are keeping firearms and narcotics ... in satchels because they're more concealable than carrying a backpack." Officer Volcin asked Mabry about it:

Volcin:     What's in your satchel?

| | |
|---|---|
| <u>Mabry</u>: | What you mean?  That's my— that's my stuff in my satch.  Nothing in my satch. |
| <u>Volcin</u>: | Let me see [indecipherable].  Let's take a look at it real quick. |
| <u>Mabry</u>: | There's nothing in my satch, man.  Come on, man. |
| <u>Volcin</u>: | You ain't got to open it.  You ain't got to open— |
| <u>Mabry</u>: | Come on, man.  I don't got nothing on me.  I'm gonna, I'm gonna leave.  I don't have nothing on me.  Sir, I don't have nothing on me.  Nothing. |
| <u>Volcin</u>: | Satch— |
| <u>Mabry</u>: | Nothing.  Nothing.  Nothing in my satch.  Come on, man. |
| <u>Volcin</u>: | You got nothing in your satch? |
| <u>Mabry</u>: | Nothing. |
| <u>Volcin</u>: | Let me see it real quick.  Let's see that. |
| <u>Mabry</u>: | Come on.  Come on, man. |

Officer Goss testified that during this exchange Mabry appeared to be "trying to blade his body, the right side of his body, away from Officer Volcin's attention."  Officer Goss also observed Mabry had been "very forthcoming prior to that, in showing his waistband, that he didn't have anything in it, but was trying to conceal the fact that he had a satchel over his

shoulder." Officer Volcin never grabbed Mabry or the satchel, nor did he tell Mabry he could not leave.

Towards the end of the exchange Mabry appeared to remove some headphones from his jacket pocket and show them to Officer Volcin. He then took off running. Officer Volcin gave chase and Officer Goss joined. As they were running, Mabry discarded the satchel, which Officer Goss recovered. Mabry eventually stopped running and Officer Volcin handcuffed him. Officer Goss handed the unopened satchel to Officer Volcin.

Officers Goss and Volcin walked Mabry back toward the site of their initial encounter. As they did so, Officer Volcin opened the satchel and discovered a spring for a large-capacity magazine. While walking, Mabry made two unsolicited statements indicating he was in possession of a firearm. He later said the police were lucky he did not start shooting. In response to questions about what he had in his pockets, Mabry said he had drugs. As officers were discussing the satchel, Mabry said it also contained drugs.

All in all, Mabry was found in possession of a Glock 26 9mm pistol, 30 rounds of ammunition, an extended magazine, crack cocaine, and amphetamines. He was charged with possession with intent to distribute both crack cocaine and N-Ethylpentylone, each in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C), possession of a firearm by a felon, 18 U.S.C. § 922(g)(1), and possession of a firearm during a drug offense, 18 U.S.C § 924(c)(1).

Mabry moved the district court to suppress the physical evidence and the incriminating statements. He argued he was seized "either when he lift[ed] his shirt," or "[d]uring the course of the aggressive questioning from [Officer Volcin]."

He contended no reasonable person would have felt free to leave after seeing Officer Goss interdict the man who tried to walk away and Officer Volcin pat down the man standing next to Mabry; his flight, therefore, came after he had submitted to police authority. Because the officers had neither probable cause nor a reasonable suspicion when they seized him, Mabry argued, all evidence obtained after he fled had to be suppressed. The Government countered that the officers did no more than ask questions, which does not alone give rise to a seizure; the officers did not, for example, touch Mabry or physically limit his ability to leave. It also argued Mabry abandoned the satchel so he had no constitutionally protected interest in it.

The district court denied Mabry's motion. It observed the pre-flight questioning was "a consensual encounter in the first instance" because police officers do not need a suspicion, much less probable cause, to approach a person and ask questions: No seizure occurs "so long as a reasonable person would feel free to leave." Finding "no indicia that [Mabry and the other men] were prevented from leaving," the court concluded Mabry's pre-flight interaction with Officer Volcin was consensual. Mabry subsequently agreed to a stipulated trial to preserve his right to appeal his motion; he then pleaded guilty.

## II. Merits

Where a district court denies a defendant's motion to suppress evidence, this court reviews the court's factual findings for clear error and the legal question "whether and when a seizure occurred" de novo. *United States v. Delaney*, 955 F.3d 1077, 1081-82 (D.C. Cir. 2020). "A Fourth Amendment seizure occurs when physical force is used to restrain movement or when a person submits to an officer's show of authority." *Id.* at 1081 (internal quotation marks omitted). Mabry was not physically restrained, so he was

7

seized if and only if (1) the police made a show of authority, and (2) Mabry submitted to that show of authority. Mabry bears the burden of demonstrating both elements. *United States v. Castle*, 825 F.3d 625, 633 (D.C. Cir. 2016).

**A. Show of Authority**

"A show of authority sufficient to constitute a seizure occurs where the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business, or, put another way, where a reasonable person would have believed that he was not free to leave." *Delaney*, 955 F.3d at 1081 (cleaned up). Courts addressing this issue "consider the totality of the circumstances, including whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled." *Id.* (cleaned up).

Mabry highlights several facts to show the officers' conduct amounted to a show of authority. First, he notes it was nighttime when multiple uniformed officers approached together, effectively "corral[ling]" him against a fence. Second, he contends the officers' conduct towards the other two men communicated that a reasonable person in his situation would not feel free to leave. For example, he points to Officer Goss's having walked toward the man trying to walk away and "impeding his forward progress." Mabry saw that person was subsequently frisked. Third, Mabry claims Officer Volcin's conduct, including his pat-down of the man standing next to Mabry, conveyed an intention to search him as well.

Fourth, he argues Officer Volcin's repeated instructions to show the satchel conveyed that compliance was required.[1]

The Government argues the officers' conduct here did not involve the kind of steps courts have found constitute a show of authority: The officers did not use a siren, display weapons, or aggressively control the three men's movements. Rather, the Government argues they did no more than approach the three men to ask some questions which, the Government notes, we have held does not constitute a show of authority. *See, e.g.*, *United States v. Gross*, 784 F.3d 784, 788 (D.C. Cir. 2015) ("Questions alone ... ordinarily do not amount to a 'show of authority.'"); *United States v. Goddard*, 491 F.3d 457, 461 (D.C. Cir. 2007) (observing "the presence of multiple officers does not automatically mean that a stop has occurred," and explaining the police may "approach individuals and interact with them" without necessarily seizing them). Further, the individual standing next to Mabry "casually walked away" while Officer Volcin questioned Mabry, and the fence Mabry was leaning against ended nearby, leaving an avenue for him to leave. Finally, the Government contends Officer Volcin's language and tone did not indicate Mabry was required to show his satchel. According to the Government, that Mabry's associates were patted down does not change this. *See United States v. Drayton*, 536 U.S. 194, 206 (2002) ("The arrest of one person does not mean that everyone around him has been seized by police.").

---

[1] Mabry claims these statements were commands, not questions, and any contrary finding by the district court was erroneous. *See* Opening Br. at 26-27 ("'Let me see,' did not require an answer; it told Mr. Mabry to do something."). Although we tend to agree, we need not decide whether the district court's contrary finding was clearly erroneous because these statements are not necessary to our conclusion that Mabry was seized.

This case illustrates how a consensual encounter with the police can, subtly but surely, ripen into a show of authority that triggers the Fourth Amendment. Although no one of the facts to which Mabry points would by itself constitute a show of authority, when viewed together they tell a different story. The Government is, of course, correct that the police "may generally ask questions" of a person even when they "have no basis for suspecting a particular individual." *Gross*, 784 F.3d at 787 (quoting *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). Critically, however, their questioning can evolve into a show of authority if they "convey a message that compliance with their requests is required." *Id.* That is precisely what happened here.

The Fourth Circuit's decision in *United States v. Wilson*, 953 F.2d 116 (4th Cir. 1991), is instructive. In that case, the court analyzed "the effect of a person's unsuccessful attempt to terminate what began as a consensual encounter." *Id.* at 121. Several police officers who were monitoring for drug activity at an airport approached Wilson, an arriving passenger. *Id.* at 118. They asked if they could speak with him. *Id.* He agreed and consented to a search of his bag and person. *Id.* The police then noticed he had two coats and asked permission to search them; Wilson angrily refused and began to walk away. *Id.* One officer walked alongside Wilson and tried "to reason with him." *Id.* Wilson explained that "there were some private things that he didn't want [the police] to see." *Id.* When he asked why the police were stopping him, the officer responded, "I am not stopping you, you are free to leave, you can leave if you like." *Id.* The officer – who was still walking alongside Wilson toward the airport exit – asked permission for a dog to sniff the coats; Wilson refused. *Id.* at 118-19. As Wilson exited the airport, the officer noticed one of the coats had a "bulge coming from one of [its] pockets." *Id.* at 119. He

continued to press the defendant who was now walking down a sidewalk outside the airport. *Id.* Wilson finally relented and, after the officer discovered what turned out to be crack cocaine, grabbed his coat and tried to flee. *Id.* at 119-20.

The court held this conduct amounted to a show of authority:

> [T]he persistence of [the police] would clearly convey to a reasonable person that he was not "free to leave" the questioning.... Despite his best efforts, Wilson was unable to terminate the encounter, to ignore the police presence and go about his business, or to go on his way. The coercive effect of the policemen's actions must be evaluated in light of Wilson's response.... The principle embodied by the phrase "free to leave" means the ability to ignore the police and to walk away from them.

*Id.* at 122 (cleaned up). The same principle, applied here, shows a reasonable person in Mabry's situation would not have felt free to leave. By the time Officer Volcin noticed the satchel, Mabry had already seen the police prevent one of his associates from leaving and pat down both of them. Even assuming Officer Volcin did not command Mabry to show him the satchel, the persistent nature of his questioning – which continued despite Mabry's attempts to end the encounter – communicated that Officer Volcin was not taking no for an answer. The broader context intensified the coercive nature of the encounter. For example, the entire encounter occurred at night, with uniformed officers shining their flashlights at the three men, while Mabry's avenues of egress were at least partially restricted by the officers, their car, and a fence. *See Delaney*, 955 F.3d at 1083 (finding a show of authority where the police "pulled into a narrow parking lot at night; trained their take-down light on the defendant's car; and, most

11

importantly, parked their cruiser within a few feet of the defendant's car" (cleaned up)). Considering all the circumstances, a reasonable person would not have felt free to ignore Officer Volcin and walk away.

The Government would have the court distinguish *Wilson* and rely upon *Gross*: Unlike the officer in *Wilson*, "Volcin asked only to see – not search – the satchel," and the whole "interaction [here] was very brief." Whatever may be said of those differences, they do not change the persistent nature of Officer Volcin's questioning which, when viewed in context, would convey to a reasonable person that walking away was not an option.

The Government's reliance upon *Gross* is misplaced. The defendant in that case argued he had been seized when a patrol car pulled up and one of the four officers in it asked him – from the car – whether he had a gun and if he would show his waistband. 784 F.3d at 787. We held that did not constitute a seizure of the defendant and noted that the defendant did not argue the encounter "subsequently ripen[ed] into a seizure when [a different officer] exited the police car and asked if he could check [the defendant] for a gun." *Id.* at 788. Therefore, we had no occasion in *Gross* to analyze an officer's persistent questioning of a person who clearly wished to terminate the encounter. *Id.* That questioning, by itself, does not necessarily constitute a show of authority does not mean questioning never constitutes a show of authority regardless of the surrounding circumstances.

**B. Submission**

Having concluded the police made a show of authority, we must determine whether Mabry submitted to it. "[W]hat may amount to submission depends on what a person was doing

12

before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Delaney*, 955 F.3d at 1084 (quoting *Brendlin v. California*, 551 U.S. 249, 262 (2007)).

Mabry argues he submitted by twice lifting his shirt to show his waist "in response to Officer Volcin shining a flashlight on him and speaking to him." He had just seen the officer shine his flashlight on and pat down the man next to him, then shine the light back on himself. He also argues he "continued to submit by remaining stationary against the fence" during Officer Volcin's repeated demands to see his satchel.

The Government argues any submission was feigned and therefore does not count. In its telling, Mabry stayed to answer questions "only as part of his gambit to divert Officer Volcin's attention away from his satchel." The Government also contends Mabry's blading his body was a "furtive gesture[]" and he "raised his shirt to appear cooperative, while actually concealing the contraband-laden satchel."

Our decision in *United States v. Brodie*, 742 F.3d 1058 (D.C. Cir. 2014), resolves this issue. In that case, two police officers sat in their car waiting to search the house of a murder suspect when they saw the defendant come out. *Id.* at 1060. The officers pulled up to the defendant and one "got out of the car and told [him] to put his hands on a nearby car." *Id.* At first he complied but shortly thereafter tried to flee. *Id.* We found the defendant's submission genuine, even if brief:

> Nor does anything in the record suggest that Brodie had some ulterior purpose in putting his hands on the car, such as a belief that doing so would facilitate escape. Contrary

to the government's position, the short duration of Brodie's submission means only that the seizure was brief, not that no seizure occurred. Later acts of noncompliance do not negate a defendant's initial submission, so long as it was authentic.

*Id.* at 1061. Feigning submission makes sense only if done for the purpose of "facilitating escape." *See id.* ("[P]utting one's hands on a car when ordered to do so is quite different from stopping a car just until the moment that an officer's almost inevitable exit provides an improved chance of escape.").

By staying where he was even as Officer Volcin's questioning grew more persistent and not leaving though he clearly wanted to, Mabry submitted to Officer Volcin's show of authority. That his submission was brief makes it no less genuine. Nothing about his submission could have improved his chances of escape.

The Government counters with *United States v. Huertas*, in which the Second Circuit held a defendant did not submit when he remained still and briefly answered questions police asked from their car: He hoped that the officer "would drive away after being satisfied with answers to his questions." 864 F.3d 214, 217 (2017). Significantly, however, there is no indication that the defendant in *Huertas* was trying to communicate a desire to limit or end the encounter. Mabry, by contrast, had been trying to do just that – most obviously when he said "I'm gonna leave."

The Government's argument boils down to saying Mabry's submission to the police show of force – he did not leave – must have been feigned because he did not further consent to Officer Volcin's demand to examine the satchel. Full compliance would be evidence of consent and partial

compliance would be evidence of feigned submission. Catch-22! Neither logic nor law supports that position.

### III. Conclusion

We conclude Officer Volcin's persistent questioning, viewed in the totality of the circumstances, would leave a reasonable person with the view that he was not free to leave. We also conclude Mabry submitted to that show of authority by remaining where he was for a time. Therefore, we reverse the district court's denial of Mabry's motion to suppress, vacate Mabry's conviction, and remand this case for further proceedings consistent with this opinion.

*So ordered.*