# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued March 18, 2024          Decided August 6, 2024

No. 21-3064

UNITED STATES OF AMERICA,
APPELLEE

v.

ANTONIO MALACHI BRYANT,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cr-00262-1)

---

*Sandra Roland*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Tony Axam Jr.*, Assistant Federal Public Defender, entered an appearance.

*Chimnomnso N. Kalu*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Chrisellen R. Kolb* and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

Before: WILKINS and CHILDS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Five police officers from the Crime Suppression Team were patrolling Southeast Washington when they spotted Appellant Antonio Malachi Bryant. They searched him and found a gun on his person. Charged as a previously-convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), Bryant moved to suppress the gun because it was the fruit of a seizure that arguably violated the Fourth Amendment. The District Court denied Bryant's motion to suppress. We agree with the District Court that officers had reasonable articulable suspicion when they seized Bryant and thus the seizure was constitutional.

## I.

## A.

The following factual summary is based on the District Court's factual findings, parties' statements, and footage from two officers' body-worn cameras ("BWC"). Officer Anthony Smith and Officer Manuel Benites's BWC were on before, during, and after the relevant time period.[1] Their videos have the same timestamps.

On the evening of Monday, November 9, 2020, five police officers were conducting two-car firearm interdiction in the Southeast quadrant of Washington, D.C. Appellant's Appendix ("A.") 164. While Officers Smith, Benites, and Dennis Sfoglia were in an unmarked car, two other officers were in a different marked car. *Id*. All five of them were wearing their uniforms and carrying their weapons. *Id.* Both police cars drove up opposite ends of the "horseshoe-shaped" driveway of the Friendship Court Apartments. *Id*. at 164–65.

---

[1] Only Officer Smith's body-worn camera recorded audio during the relevant time period.

As Officer Smith explained in his testimony, the driveway had a parking lot in the middle and on the top of the hill that is not visible from the street. *Id.* at 96. Officer Smith testified that, when his police car was pulling into the horseshoe driveway, his car window was open and he heard someone yell, "12[,]" which is a colloquial code word for police. *Id.* at 165. As his police car was still moving toward the parking lot, he saw Bryant walk away from two individuals who were standing by a black sedan, which was parked parallel to the sidewalk. *Id.* Officer Smith first saw Bryant from his police car when he was about three or four car lengths from him. *Id.* Walking away from the black sedan and the direction that Officer Smith's police car was coming from, Bryant headed toward a white SUV, which was parked behind the black sedan and adjacent to the same sidewalk. *Id.* at 166. According to Officer Smith, Bryant adjusted his waistband, and looked over his shoulder several times. *Id.* The white SUV's passenger-side front door was open by the sidewalk. A woman was standing behind the open car door. *Id.* at 167.

As shown by his BWC footage, Officer Smith exited the unmarked police car at 19:39:48. *Id.* at 166. At that time, Bryant was on the sidewalk near the woman standing by the white SUV. *Id.* While the woman and the white SUV were on one side of the sidewalk, a row of trash cans, bushes, and a fence were on the other side. *Id.* at 167. Having seen Bryant walk up the sidewalk and look over his shoulder, Officer Smith decided to follow him and began "walk[ing] briskly up the road toward[]" him. *Id.* at 166. During the walk, Officer Smith passed six or seven individuals. *Id.* Three or four individuals were near or inside the black sedan, and three other people were standing by the back of the white SUV. *Id.* at 166–68. Officer Benites walked behind Officer Smith. Both officers confirmed with each other that a child was in the black sedan. *See* Officer Smith's BWC Footage at 19:39:50. An unidentified man repeatedly told someone else to "get the babies." *Id.* at

19:39:51–56. Officer Smith briefly greeted the people standing by the black sedan while walking toward Bryant. *Id*. at 19:39:52.

When Officer Smith was making his way to Bryant from one side of the driveway, the marked police car travelled up the other side of the driveway and became visible in Officer Smith's BWC at 19:39:51. The marked police car stopped a few car lengths from the back of the white SUV and turned on its top lights, which shone in the general direction of the white SUV but did not illuminate Bryant or the area behind the SUV where he was standing. A. 167, 176.

At 19:39:55, Officer Smith walked past the front of the white SUV and toward its rear. Bypassing the sidewalk area by the front of the SUV, he went around the rear of the SUV to reach the sidewalk and Bryant from the other side. *See* Officer Smith's BWC Footage at 19:39:55–19:40:00. Bryant turned his head away from Officer Benites—who was about three or five feet from the front of the white SUV and was approaching Bryant from the road—and toward the back of the SUV, the direction that Officer Smith was coming from. *See* Officer Benites's BWC at 19:39:59. A second later (and twelve seconds after Officer Smith exited the police car), Officer Smith had cleared the corner and could see Bryant, who was approximately half a car length away. A. 176.

Still walking toward Bryant, Officer Smith said, "You ain't got no guns on you, do ya?" Officer Smith's BWC at 19:40:00. Officer Smith briefly raised his left arm. Officer Benites's BWC Footage at 19:40:01. He also placed his right foot on the sidewalk at the same time. Bryant responded, "Nah." Officer Smith's BWC Footage at 19:40:01. Officer Smith asked Bryant if he "stepped off" then said, "What's that? What's that bulge right there, bro? Hold up. Right there." *Id*. at 19:40:02–05. Bryant then turned his head toward Officer

Benites, who proceeded to point his flashlight at him. Bryant took two steps away from Officer Smith and toward Officer Benites, then put his hands inside his sweatshirt's front pocket. Officer Benites's BWC Footage at 19:40:03–06. The woman who was standing by the SUV's passenger-side door left the area. *Id.* at 19:40:05–08. Officer Smith grabbed Bryant's hand inside the pocket and said, "That's not a gun? HOLD IT! Wait a minute!" Officer Smith's BWC Footage at 19:40:06–07. Bryant resisted. During the struggle, Officer Smith said, "7A[,]" which is a police code word for a gun. *Id.* at 19:40:15. After a struggle, the officers recovered the gun on Bryant's left calf and had to cut his pants to do so. A. 171.

**B.**

The District Court concluded that it did not need to decide when exactly the encounter turned into a seizure because it began after Officer Smith saw the bulge and, by then, Officer Smith had a reasonable articulable suspicion to detain and search Bryant. A. 187.

**II.**

When the District Court "denies a defendant's suppression motion, we review de novo 'claims regarding whether and when a seizure occurred' as well as the 'district court's ultimate determination of whether a police officer had the reasonable, articulable suspicion . . . necessary to legally effectuate' the stop." *United States v. Delaney*, 955 F.3d 1077, 1081–82 (D.C. Cir. 2020) (alteration in original) (quoting *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016)).

We review the District Court's factual findings for clear error. *Castle*, 825 F.3d at 635. Under that standard, we will affirm those findings unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Hale-Cusanelli*, 3 F.4th 449, 455 (D.C. Cir. 2021)

(quoting *United States v. Munchel*, 991 F.3d 1273, 1282 (D.C. Cir. 2021)). We must "give due weight to inferences drawn from those facts by [district court] judges[.]" *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

**III.**

A Fourth Amendment seizure occurs when police officers use a "show of authority" to which an individual yields. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991). If an individual submits through "passive acquiescence," the "test for telling when a seizure occurs" is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave[.]" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). To decide whether a reasonable person would have believed they were free to leave, we "consider the totality of the circumstances[.]" *Delaney*, 955 F.3d at 1081. The relevant factors for making such a determination include "whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled." *Castle*, 825 F.3d at 632–33 (quotation marks, citation, and alteration omitted); *see also Delaney*, 955 F.3d at 1081. Further, "[t]he person challenging the seizure 'bears the burden of demonstrating that he was seized.'" *Delaney*, 955 F.3d at 1081 (quoting *Castle*, 825 F.3d at 633).

As relevant here, if an officer seizes an individual without probable cause, the seizure is lawful only if the officer has reasonable articulable suspicion that the individual being seized "is engaged in criminal activity." *Reid v. Georgia*,

448 U.S. 438, 440 (1980).  The government has the burden "to provide evidence sufficient to support reasonable suspicion justifying any such stop."  *Castle*, 825 F.3d at 634.

Bryant conceded that the District Court correctly ruled Officer Smith had reasonable articulable suspicion to stop and search Bryant once Officer Smith saw the bulge.  Bryant's Reply Br. at 14; Oral Argument Tr. at 15.  Following this logic, Bryant can prevail on his appeal only if he shows that he was seized before Officer Smith observed the bulge.  But the record shows otherwise.

Bryant contends that he was seized at 19:40:00, when Officer Smith rounded the white SUV and asked him about having guns, because, at that time, his means of egress on the sidewalk was blocked on both sides, with one officer on each side.  According to Bryant, Officer Smith had not seen the bulge by that time.  As the District Court found, "at 19:40:00, . . . Officer Smith cleared the back of the white SUV and stepped onto the sidewalk."  A. 168.  Officer Benites's BWC footage shows that Officer Smith was not blocking Bryant's means of egress at that time.  At 19:40:01, Officer Smith only had one foot on the edge of the sidewalk.  This is fatal to Bryant's argument that he was blocked and seized at 19:40:00.

The District Court further found that Officer Smith saw the bulge around that time.  A. 169 (crediting Officer Smith's testimony that he saw the bulge while asking the initial questions).  As explained by the District Court, Officer Smith's testimony is corroborated by Officer Benites's BWC footage, which shows Officer Smith raising his left arm for the first time at 19:40:01, a second after he asked the first question about having guns, and using the same arm to point at Bryant's waist at 19:40:03.  *Id*.  The District Court's conclusion is consistent

with Officer Benites's BWC footage, which also shows Officer Smith focusing his attention on Bryant's waist at 19:40:02.

In the end, the record demonstrates that Officer Smith observed the bulge when he was stepping onto the sidewalk, and thus he developed reasonable articulable suspicion at the same time he began to block Bryant's path. Because Officer Smith had reasonable articulable suspicion when he seized Bryant immediately after, the seizure did not violate the Fourth Amendment.

Bryant challenges the District Court's findings that Bryant decided to restrict his own movement by staying beside the SUV and that he did not know where Officer Benites was, so he could not have known that he was blocked on both sides or was about to be. But whether the District Court erred in making these findings would not change the analysis here. After all, any such "blocking," whether perceived by Bryant or not, did not occur until after Officer Smith developed reasonable articulable suspicion.

Prior to when Officers Benites and Smith blocked Bryant's path from both directions, Bryant was not seized through other means. It is not sufficient that two uniformed police officers walked directly to Bryant at night and approached him from both directions, where police cars were present and where one of those police cars had its top lights on.

Police officers have the right to approach an individual in a public place. *See Florida v. Royer,* 460 U.S. 491, 497 (1983) (explaining that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place"). We clarified in *Delaney* that officers can approach an individual without turning the encounter into a seizure, unless the "police conduct [at issue] 'lacks a traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of the police

officer.'" 955 F.3d at 1084 (alteration omitted) (quoting *United States v. Jones*, 678 F.3d 293, 300 (4th Cir. 2012)). When officers clearly target a defendant, that hallmark is generally not present. *Id.* In *Delaney*, where the police officers parked in the narrow parking lot's exit lane a few feet from the front of the defendant's car and shone their take-down lights on the defendant's car, *id*. at 1083–84, we said such "'targeted'[] conduct toward [the defendant] indicated that he was not free to ignore their presence[,"] *id*. at 1084. We took partial blocking into account there because the police officers impeded the only means of egress from the parking lot as they approached Delaney's vehicle. Here, the officers did not block or impede Bryant's only means of egress from the sidewalk as they approached him.

Assuming that Officer Smith did not see the bulge until after asking his first question, his first question—"you ain't got no guns on you, do ya?"—did not turn the encounter into a seizure. *See Gomez v. Turner*, 672 F.2d 134, 142 (D.C. Cir. 1982) ("The approach and direction of a question by a police officer cannot be, as a matter of fact or of law, a seizure of the person so approached.").

Nor did "the presence of multiple officers" transform an encounter into a seizure in this case. *United States v. Goddard*, 491 F.3d 457, 461 (D.C. Cir. 2007). As the District Court pointed out, police officers "often approach [individuals (in groups of two or more)] not as a show of authority but to reasonably ensure both the safety of the officers and the approached individual in the community." A. 181.

## IV.

For the foregoing reasons, we affirm the District Court's denial of Bryant's motion to suppress tangible evidence.

*So ordered.*